IN ERROR.
• • • • • • •

ALBANY,
April, 1823.

WOODCOCK, appellant,

*against*

SILAS BENNET, respondent.

WOODCOCK
v.
BENNET.

A valuable or meritorious consideration is necessary, in a contract, to warrant a decree for its specifick performance.

But where the party accepts a draft, as security for the consideration, and does not use due diligence in demanding payment and giving notice to the drawer, &c. he cannot resist a specifick performance, on the ground that it has not been paid.

By such neglect, he makes the draft his own, and the party will not be decreed to pay him the money, as a condition of the decree.

When one agrees to convey by quit claim, the agreement has reference to the title as it is at the time of the agreement—not to one subsequently acquired.

And if the covenantor have no title at the time, there is nothing upon which a decree for a specifick performance can operate ; and it would be inequitable to decree the conveyance of a title subsequently acquired.

In a court of chancery, every material allegation should be put in issue by the pleadings.

No interrogatories can be filed, which do not arise from, or relate to some fact thus in issue.

A sale of land, under a *fi. fa.* will not be avoided, though the judgment be afterwards reversed for error.

So of an erroneous *fi. fa.* as if it issue after the year and day, without a previous *sci. fa.*

Otherwise as to a *fi. fa.* which is irregular.

The distinction between *erroneous* and *irregular* process considered.

An *erroneous* execution is valid to the time of sale under it :

Otherwise of an irregular execution ; which, when set aside, is considered a nullity from the beginning :

And this, even against a *bona fide* purchaser under it.

When a rule sets process aside for *irregularity*, without saying more, and the particular cause is not shewn in evidence, the process will be deemed to have been irregular and void from the beginning.

This is the usual form of the rule, whether the process be considered *voidable* or *void*.

The particular cause may, therefore, be shewn in evidence ; as, that the *fi. fa.* issued after a year and day, without a previous *sei. fa.*

An execution, issuing after a year and day, without a previous *sei. fa.* being *erroneous* and *voidable*, merely—not *void*—a sale under it would be valid, though it be afterwards set aside :

And the party grieved must take his remedy against the party at whose suit the *fi. fa.* issued.

IN ERROR.
••••••

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

Though one of two joint judgment debtors die, yet execution may issue against the survivor, or against his personal property.

A judgment survives as to the personalty.

Execution should issue against both defendants, by name, so as to correspond with the judgment;

But can be enforced against the survivor alone.

The personal estate of the deceased debtor is, in such case, discharged at law.

But these rules, in relation to execution, do not apply as to the realty.

Against the real estate execution cannot issue, nor be enforced, without a *sci. fa.* against the survivor and the heirs, or terre-tenants, &c. of the deceased, to shew why the money should not be levied of their respective lands, without mentioning goods.

If it issue without a *sci. fa.* it is void, and may be set aside.

And an innocent purchaser under it will not be protected.

It is thus void, and a sale under it is a nullity, even as to the lands of the survivor.

*It seems*, that process, void in a material part, cannot be good as to the residue.

The judgment does not survive as to the realty.

It is a general rule, that where any new person is to be better or worse by the execution, there must be a *sci. fa.*

An execution cannot be said to be *voidable*, merely, unless there is a party living who can avoid it.

Where he is living, he may, by motion, arrest the sale upon a voidable execution.

If he suffer the sale to take place, and the land be sold to a *bona fide* purchaser, the sale will be valid, though the execution be afterwards set aside.

Irregularity may be either in the process itself, or in the mode of issuing it.

What is meant by process being irregular *on its face.*

It does not mean that the irregularity should be stated in the writ;

But it may be by reference to extrinsick circumstances; as the terms of the court, or the death of the party.

If a defendant die, the plaintiff cannot have execution, without a *sci. fa.* even against the person or personal property, unless the execution be tested in the defendant's life time.

The statute, (1 *R. L.* 504, *s.* 11) which gives remedy to a purchaser under an irregular execution, or for want of title in the person against whom it issues, is not in affirmance of the common law ; but it gives a *remedy*, which did not exist previously.

The purchaser was already protected, at common law, in case of a reversal or setting aside a judgment or execution for error.

But the word *irregularity*, in the statute, refers to *void*, not *voidable* proceedings, and gives a remedy in chancery.

Where an answer to a bill filed is responsive to the bill, and within the discovery sought, it is legal evidence in all cases.

And this, whether it is a denial of some fact alleged by the complainant, or sets up a fact by way of avoidance merely.

This rule illustrated and applied.

Where there is no circumstance to make a strong impression on the mind of a witness, little reliance can be placed on his recollection of particular dates, several years before he testifies.

A seeming conflict of evidence should be scrutinized strictly, to see if it is susceptible of explanation, or incapable of being reconciled.

If it is intrinsically of a negative character, it does not necessarily destroy what is testified affirmatively.

And if one fact is not wholly inconsistent with another, it may well be considered that each witness has spoken truly.

These rules of evidence considered and applied.

Where land is bound by a judgment against a previous owner, and the present proprietor covenants with another, to give him a quit claim deed of an undivided share thereof, at a certain day, and the day passes, and the covenantor conveys the land away, on a bill filed by the covenantee, for a specifick execution, a court of chancery ought not to decree an equivalent in damages to the value of the land, without providing that the covenantee shall first pay or secure a proportion of the judgment, corresponding to the proportion which the share he contracted to purchase bears to the whole land bound by the judgment.

In such a case, a court of chancery may refer it to a master, to assess the damages;

And need not, except under very peculiar circumstances, award an issue of *quantum damnificatus.*

Where a party has put it out of his power to perform, specifically; yet, a bill filed for a specifick performance will be retained, and an equivalent in damages awarded, to be assessed on reference to a master, or to a jury upon an issue of *quantum damnificatus,* according to circumstances.

The chancellor's duty, as to awarding issues in general, discussed by counsel.

APPEAL from the Court of Chancery. The respondent, *October,* 1819, filed his bill, in the Court below, against the appellant, for the specific performance of articles of agreement, dated the 30*th* day of *November,* 1815, by which the appellant, for the consideration of $560, secured to be paid, covenanted to release and quit claim to *Phinehas Bennet, Phinehas Bennet, jun.* and the respondent, on or before the 1*st December,* 1816, the right, title and interest of the appellant, to three undivided fourth parts of a parcel of land, lying in lot 94, at *Ithica,* in the town of *Ulysses,* subject to certain exceptions mentioned in the articles. The inducement for entering into this covenant was the following : On the 26*th May,* 1813, *Benjamin Pelton* sold and conveyed to *Phinehas*

IN ERROR.
••••••••
ALBANY,
April, 1823.

Woodcock
v.
Bennet.

*Bennet* the premises in question, and received from him a mortgage thereon of $4000 to secure the consideration money. On the 7*th February*, 1814, *Phinehas Bennet* sold and conveyed to the respondent, an equal undivided half of the same premises. The deed was delivered to the appellant, to be given up to the respondent, after he had satisfied the mortgage given to *Pelton*, and he afterwards paid $1200 thereon. On the 16*th September*, 1813, lot No. 94 was sold by virtue of an execution, issued out of the Supreme Court, against *Benjamin Pelton* and *Richard W. Pelton*, upon a judgment docketed *October* 12, 1810, in favour of *Walter Wood.* The appellant became the purchaser for the sum of $493,62, and received a Sheriff's deed. After this purchase, and until the execution was set aside for irregularity, it was considered by all parties, that the appellant had acquired a good title, and that the mortgage to *Pelton* would become inoperative. *Phinehas Bennet* and the respondent rescinded their contract, and the former gave an order on *Pelton*, in favour of the appellant, for the amount of the purchase, which order *Pelton* refused to accept, and has never paid ; nor did the appellant attempt to enforce it by charging the drawer. The *Bennets* released to the appellant all their right to the premises (being an equity of redemption) and thereupon the appellant executed the covenant to convey.

The execution, under which the appellant purchased, was set aside for irregularity, on motion to the Supreme Court, in *August* term, 1816, which was supposed by the parties to let in the mortgage to *Benjamin Pelton*, then held by one *Wells*, as assignee. *Wells* exacted the specie, and the respondent, with *Phinehas Bennet*, made several unsuccessful attempts to raise the money, which amounted to about $3000.

The agreement of the 30*th November* was never fulfilled by the execution of the quit claim ; but the appellant set up in his answer, that on the 27*th December*, 1816, the respondent came to *Ithica* from *Chenango*, whither he had removed the 1*st* of *November* preceding, and by the consent of all parties that agreement, was taken up and rescinded, and new articles made between the appellant and *Phinehas Bennet* and *Phinehas Bennet, junior*, containing arrangements for bid-

ding in the premises under the mortgage, and detailing the manner in which they should be disposed of between the parties.

IN ERROR.
. . . . . . .
ALBANY,
April, 1823.
Woodcock
v.
Bennet.

This new arrangement, except so far as it related to the respondent, was not questioned by the pleadings or proofs. But the respondent's alleged participation therein gave rise to the prominent question of fact in the cause, which is fully considered in the opinion of the Court, with the allegations and evidence relating to it. It was alleged by the respondent, but denied by the appellant, that the latter had fraudulently procured the articles of the 30th November, from one *Bingham*, with whom they had been left by both parties; and that after so obtaining them, the appellant had cancelled and destroyed them.

With the assistance of one *Avery*, the appellant finally succeeded, *January* 11, 1817, in purchasing, and obtaining a conveyance in fee of the premises, under a mortgage sale by *Wells*, at $3200, which he paid, and before the filing of the bill, he had conveyed away to different persons his interest in all the premises, with the exception of about one undivided 6th part; and about $4000 had been expended, by the different proprietors, in improvements upon the property.

The appellant insisted by his answer, that the respondent had abandoned all claim to the premises, the evidence in relation to which is also sufficiently detailed in the opinion of the Court. It did not appear that the respondent had given any notice of his claim to the parties claiming an interest in the premises, from the time of his removing to *Chenango*, till about the time of filing his bill.

Shortly before filing the bill, it was discovered that there was another judgment in the Supreme Court, in favour of one *Lamberson* against *Benjamin Pelton*, which had been docketted 8th December, 1807, for $1287,68, and which was supposed to be a lien on the premises and under a *fi. fa.* upon which they were advertised for sale. This judgment was set up in the answer; and that the appellant apprehended he should, with the other parties in interest, be obliged to pay it.

The remaining facts, necessary to an understanding of the points raised and decided, are very fully detailed in the opinion of the Court.

IN ERROR.

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

The cause having been heard on pleadings and proofs in the Court below, his Honor the Chancellor, (*February* 22, 1822) decreed, that the complainant was entitled to a specific performance of the articles of the 30*th November*, and that the performance should consist of a release and conveyance in fee (without warranty) of a right and title to one undivided fourth part of the premises, being part of lot 94, &c. subject to the exceptions, &c. But inasmuch as it appeared from the answer of the defendant, that he, since the execution of the articles, by parting with his right and title, or otherwise, had disabled himself from fulfilling the articles, and that he retained only an undivided 6th part, the decree further declared, that the complainant was entitled to a compensation in damages for the value of his claim and right under the articles ; and that it should be referred to a Master to ascertain and report the value of the one equal undivided fourth part, on the 1*st* day of *December*, 1816, exclusive of subsequent improvements, &c. and that he compute interest upon the value from the 1*st* day of *December*, 1816, to the making of his report.

The CHANCELLOR, assigned his reasons for this decree ; but as these consisted merely in a brief examination of the proofs, their insertion is not deemed material.

*B. F. Butler,* for the appellant. We insist that the decree of the Court of Chancery should be reversed, or, at least, modified, upon the following grounds :

I. The respondent was not entitled to a specific performance of the agreement of the 30*th November,* 1815 :

1st. Because the consideration of that agreement wholly failed, and it is against the established principles of a Court of Equity, to enforce an agreement where there is either a want or a failure of consideration.

2d. Because the situation and title of the respective parties were so materially changed, after the making of the agreement, as to render it inequitable to enforce it.

3d. Because the respondent voluntarily abandoned the premises, expressly waiving the agreement, and leaving the

IN ERROR.
. . . . . .

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

appellant at liberty to make any arrangement he thought proper with *Phinehas Bennet*.

4th. Because the fact assumed by his Honor, the Chancellor, and upon which his decree is founded, that the articles of agreement were " fraudulently procured and cancelled by the defendant," is expressly denied in the answer, is not supported by proof, and if material, ought to have been determined by an issue at law.

5th. Because the respondent, with full notice of the subsequent arrangements in relation to the premises, and the improvements making thereon, interposed no claim whatever to the property, until the mortgage given by *Phinehas Bennet*, for the original purchase money, was fully paid, and until the appellant had purchased the right and title of *P. Bennet* and *P. Bennet, jun.* and by his silence and delay, the respondent forfeited all claims to a specific performance.

II. By the original agreement of the 30*th November*, 1815, the respondent was entitled only to a quit claim deed, without covenants of warranty, and yet the appellant is decreed to pay one fourth of the value of the whole premises, with interest, without taking into consideration,

1st. That the sum of $560, agreed to be paid to the appellant by the respondent, *P.* and *P. Bennet, jun.* has never been paid.

2d. That after the execution of the agreement, the appellant purchased the property under the *Wells* mortgage, and paid him the whole amount due thereon, being about $2700, exclusive of interest.

3d. That there is now a judgment in the Supreme Court against *Benjamin Pelton*, in favour of *David Lamberson*, for $1287,68, older than the title either of the appellant or *Phinehas Bennet*, which remains a subsisting *lien* upon the property, and which the appellant and his co-tenants are obliged to pay.

Whereas it is contended on the part of the appellant, that even if full effect be given to the agreement, and the respondent be entitled to a specific performance, he ought to

IN ERROR.
••••••

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

have been compelled to pay the sum of $560 and interest, or his proportion thereof, and also to contribute his just and rateable proportion of the monies due at the date of the agreement, upon the mortgage ; and to pay, or provisionally secure, his proportion of the *Lamberson* judgment.

III. If the respondent was entitled to any compensation in damages, an issue ought to have been awarded to ascertain the amount.

IV. The bill ought to have been dismissed with costs.

In endeavouring to shew the decree erroneous, the argument will be divided into two general heads : *First,* to shew that the respondent was not entitled to a specific performance of the agreement, nor to any other relief under it. *Second,* or if so entitled, the decree is erroneous in the nature, mode and extent of the relief given.

1. The consideration of the agreement wholly failed ; and either want or failure of consideration will prevent a Court of Chancery from enforcing agreements.(*a*) The consideration was $560, secured to be paid, &c. but which it is not pretended has ever been paid ; and the draft given for this sum was never accepted by the drawee, though it was presented for acceptance. There is no excuse rendered for non-payment, nor any offer to pay, nor does the decree make any provision for its payment. No other consideration is either alleged or proved. nor is it competent to shew any other, for this is the only one expressed in the agreement.(*b*) At all events, the $560 was the principal consideration ; and that having never been paid, both the reason and language of the rule apply, though there may have been other minor considerations performed.

2. The agreement related to the title derived from the Sheriff's sale, but when the Supreme Court set aside the execution for irregularity, the situation of the parties became materially altered ; and the contract not being performed before, a Court of Equity could not afterwards properly in-

(*a*) 1 *Madd. Ch.* 326. 2 *Com. Dig. tit. Chancery,* 2 C. 8. *Minturn* v. *Seymour,* 4 *John. Ch. Rep.* 500, *and cases there cited.*

(*b*) *Maigley* v. *Hauer,* 7 *John.* 341. *Movan* v. *Hays,* 1 *John. Ch. Rep.* 342. *Stevens* v. *Cooper, id.* 425. *Hildreth* v. *Sands,* 2 *id.* 43.

terfere to compel its performance. The whole foundation of
the respondent's bill is, that the appellant's title was a good
one. The contract was made with that understanding,
and if it was avoided by setting aside the execution, the bill
necessarily falls to the ground. Whether it was so avoided,
is a point not decided either here or in *England*. All that
our Courts have said is, that the title of the purchaser can-
not be impeached collaterally, upon the ground that the ex-
ecution under which he purchased was erroneous or voida-
ble ;(c) but here the execution was actually set aside on
the application of the party. It is true, that a purchaser,
under a regular judgment and execution, will be protected,
though upon writ of error the judgment be reversed.(d)
This is, 1. because the jugdment, and execution are given by
the Court; it is, therefore, the fault of the Court, not of the
party, and there is a regular execution to warrant the sale.
2. There is a distinction between a judgment or process
merely erroneous, and a judgment or process absolutely ir-
regular. Under process issued on an erroneous judgment,
the party may justify. No action lies for any act done up-
on it. But for acts done under irregular process, trespass
lies ;(e) and it is every day's practice in the Supreme
Court, to require a stipulation not to bring an action, as a
condition of setting such process aside. The ground of
this distinction is, that in one case, there is a regular execu-
tion to excuse the plaintiff ; in the other, there is nothing ;
for an irregular judgment or execution, after set aside, is a
mere nullity. It is so spoken of in the books.(f)

The most that is said, in any case, in our Supreme Court,
in favour of such an execution is, that until set aside, it is
merely voidable, which cannot be taken notice of collateral-
ly. Chancellor *Kent*, (16 *John.* 576,) waives the point as
to the effect of setting aside an execution upon the purchas-
er's title. He says, " the purchaser may justify under such
a title, at least, until the judgment and execution be set
aside for irregularity."

It is necessary for the purchaser, in an action of eject-
ment, to shew, on the trial, the judgment and the execu-

IN ERROR.
. . . . . . .
ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

(c) *Jackson*
v. *Bartlet*, 8
*John.* *Rep.*
361. *Same* v.
*Rosevelt*, 13
*id.* 97. *Same* v.
*De* *Lancey*,
*id.* 537. *Same*
v. *Robins*, 16
*id.* 537, and
*the cases there*
*cited.*
(d) 8 *Co.*
191, *Man-*
*ning's* *case.*
*Carter* v.
*Simpson*, 7
*John.* 535.
(e) *Perkin*
v. *Proctor*, 2
*Wils.* 382, and
*the cases there*
*cited.* *Read*
v. *Markle*, 3
*John.* *Rep.*
523.
(f) *Turner*
v. *Felgate*, 1
*Lev.* 95.
*Prigg* v. *Ad-*
*ams*, *Carth.*
274. *Perkin*
v. *Proctor*, 2
*Wils.* 385.
*Parsons* v.
*Lloyd*, 3 *id.*
341, 345. 2
*W. Bl.* 845. *S.*
*C.* *Simonds*
v. *Catlin*, 2
*Caines' Rep.*
61. *Read* v.
*Markle*, 3
*John.* *Rep.*
523. *Cassel*
v. *Duncan*, 2
*Serg.* & *Raw.*
*Rep.* 58, 59.

tion.(g) If bound to shew an execution, he must shew a valid one, or one which does not appear to be invalid. How then, if it is proved that his execution has been set aside for irregularity, can he support his case? Being, as we have shewn, a nullity, it is as if he had produced no execution at all.

That a plaintiff could derive no title, as a purchaser under such an execution, is clear. Can a third person, who purchases, derive any further or greater title? In *Burd* v. *Dansdale*,(h) the levy under the *venditioni exponas* was set aside by the Court, and the sale was without a new levy; and per *Tilghman*, Ch. J. " Our opinion is, that the sale was void, the *venditioni exponas* having issued contrary to the order of the Court. We have an act of assembly, protecting purchasers at Sheriff's sales, after the reversal of the judgment under which the sale was made, but there is no law protecting a purchaser in a case like the present." In *Vastine* v. *Fury*,(i) he says, that " in ejectment by a purchaser, it is competent for the other party to shew that there was no judgment to support the execution, or *that legal notice had not been given*." And but for our statute,(j) the same rule would apply here as in *Pennsylvania*. If the purchaser would be affected by a mere irregularity in the notice of sale, *a fortiori*, would he be affected by irregularity in the execution, there being no statute to protect him as to that? Our statute,(k) provides for the relief of purchasers of lands at Sheriff's sales, who are evicted on account of *any irregularity* in the *proceedings*, or want of title in the defendant," by giving them a writ out of Chancery to have the money refunded. By this act, the legislature put *irregularity* on the same ground with *want of title*; and the statute shews what the common law was. If the purchaser is not affected by irregularity, why provide for his indemnity in case of eviction?

2. But whether the title of the appellant was or was not invalidated by the execution, all the parties supposed the sale void; and the appellant, in good faith, made large advances to secure the title under the *Wells* mortgage. These advances were not in the original contemplation of the par-

(g) *Jackson* v. *Hasbrouck*, 12 John. 213.

(h) 2 *Bin.* Rep. 80, 92.

(i) 2 *Serg.* & *Rawle's* Rep. 432.

(j) 1 R. L. 505.

(k) id. 503, 4; s. 11.

ties, and it would be most inequitable to carry the agreement into effect. Of these advances, the respondent has not borne, and refuses to bear any part. The Court have a discretion in relation to decreeing performance ; and where such a change of circumstances occurs as to render it unreasonable, or inequitable, or hard, to interfere, the Court will refuse a specific performance.(*l*)

3. The abandonment of the premises, connected with the declarations and conduct of the respondent, amounted to a waiver of the agreement. An agreement may be waived by parol.(*m*)

(4. The counsel examined the evidence as to the alleged fraud, in the appellant's procuring and cancelling the articles of agreement.)

5. But whatever may be the opinion of the Court, with regard to the effect of the abandonment and declarations alone, there can be no doubt that when considered in connexion with the silence and delay of the respondent, they defeated all claim to a specific performance. The agreement was to have been performed *December 1st*, 1816 ; but the respondent waited until the mortgage was foreclosed, until new rights were acquired by arrangements and purchases, improvements made to $4000, and the appellant was unable to perform specifically ; and then filed his bill. The party who seeks a specific performance, must shew himself ready, prompt and eager, on his own part. There should be no delay—no trifling. His claim must be perfectly conscientious when he comes into Court.(*n*) Above all, the Court will not give him relief, if his conduct has been such as to mislead. The silence and delay, under the circumstances, amount to a fraud upon the appellant and those who claim under him, and it would induce a Court of Equity to protect them, even if the respondent had *owned* the land ;(*o*) a *fortiori*, where he has only an equitable interest.

The Chancellor supposes that the appellant *has not produced the least direct proof* of the respondent's consent, that the articles should be cancelled. But this is not the point. The question is, has the complainant disproved it ? The answer sets up the fact of such consent in response to the

IN ERROR.
.......
ALBANY,
April, 1823.

Woodcock
v.
Bennet.

(*l*) 1 *Mad.*
*Ch.* 321, 336,
323. *Sugden's*
*L. V.* 157-8,
*Com.      Dig.*
*Chancery,* 2 *C.*
16.    *Mason* v.
*Armitage,* 13
*Ves.* 25.
(*m*) 1 *Mad.*
*Ch.* 323.

(*n*) 1 *Mad.*
*Ch.* 328, 330.
*Lloyd* v. *Collet,* 4 *Br. Ch.*
*Cas.* 469. *Alley* v. *Deschamps,* 13
*Ves.* 225. *Benedict* v. *Lynch,*
1 *John. Ch.*
*Rep.* 370.
*Hatch* v. *Cobb,*
4 *John. Ch.*
*Rep.* 560.
(*o*)   *Parkhurst* v. *Van*
*Cortland,* 14
*John.* 20, 21
*and cases there*
*cited. Higinbotham* v. *Burnet,* 5 *John.*
*Ch. Rep.* 184

IN ERROR.

. . . . . . .

ALBANY,
April, 1823.

Woodcock
v.
Bennet.

bill. You are not to " stretch a defendant in a Court of Chancery, upon a *moral rack*," to make him speak out under pain of a decree, and then to disregard what he says, *unless he produces proof of it.* At all events, the assertion should be disproved by two witnesses. (Here the counsel examined the evidence, and insisted that the answer was not disproved, but confirmed by it.) The party stands on precisely the same ground as if he was indicted for perjury, in this answer, and the perjury was assigned in the part which insists that the articles were cancelled with the respondent's consent. This was purely a question of fact. Suppose the evidence to have left the matter in doubt : In a case, so deeply implicating the moral character of an individual, the Chancellor should have awarded an issue at law, to try the fact.

The Court of Chancery, from the earliest period of its history, has been in the habit of awarding issues to try questions of fact. It was never intended to give that Court the trial of these questions ; and, at the present day, the uniform practice in *England* is, wherever the case will admit of it, to refer the determination of mere questions of fact to a jury. We admit, that causes often present so great a variety of points, as to render it impossible to frame an issue ; but wherever it can be narrowed to a single point, an issue is awarded. Issues of *devisavit vel non, quantum damnificatus*, partnership, usury, forgery, and other questions affecting character, are familiar instances in that Court.(p) Here an issue could easily have been framed, and it was precisely such a question as the Chancellor should have referred to a jury, where the accused could have been confronted with the witnesses, and the witnesses with each other. If, then, the Court should entertain doubts, the cause should be sent back to Chancery, with direction that an issue be awarded. Deny not to the appellant a privilege which the meanest felon enjoys ; one which is the birthright of every *American*, and the distinguishing glory of the common law ; and which has elevated the judicial institutions of those rude barbarians, who issued from the *northern hive*, above the polished systems of *Justinian*—the laboured comments and philosophical refine-

(p) 1 *Mad. Ch.* 78, 207. 2 *id.* 254, *and the cases there cited. Debates of the late N. Y. Convention, Gould's ed.* 508, *per Kent, Chancellor.*

IN ERROR.
.......
ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

ments of the *Scævolas* and the *Ulpians* of antiquity. 'Tis not only the wisest and best mode of ascertaining facts for the dispensation of justice, but it forms one of the firmest bulwarks of publick liberty ; and it is not only your duty as Judges, but as patriots, to preserve it for yourselves, and transmit it unimpaired to posterity.

II. Even if the respondent was entitled to relief, the decree is wholly erroneous in the *nature, mode* and extent of the relief given.

The agreement was to convey one-fourth by *quit-claim ;* and the appellant having disabled himself from performing, by conveying away part of his interest, it is admitted that the respondent can have relief by a compensation in damages only. The question, then, should have been, what was the one-fourth worth, on the 1*st December*, 1816, without warranty, and subject to all the difficulties, as to title, which then and afterwards existed. Yet the Chancellor decreed the full value, as the measure of compensation ; being equal to a conveyance with warranty, and directly contrary to the agreement itself.

1. The Master should have been directed to deduct the $560 ; or, at least, the respondent's share of it, with interest.

2. The respondent's portion of the moneys paid to discharge the *Wells* mortgage.

3. Provision should have been made to secure the appellant, against the *Lamberson* judgment.

The rule in equity is to consider what ought to have been done as done. Suppose the appellant had executed the deed on the 1*st Dec.* 1816 ; would this have protected him from contributing his proportion to the payment of the *Wells* mortgage and the *Lamberson* judgment ?

III, IV. The bill being merely for a compensation in damages, ought to have been dismissed ; or if sustained, an issue should have been awarded, to ascertain the amount of damages, where all the circumstances might have been taken into account. In this case the respondent knew, before he filed his bill, that the appellant had disabled himself from performing. Courts of Chancery have repeatedly said, that

IN ERROR.
........
ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

they would not sustain a bill for the mere assessment of dam-
ages, but would leave the party to his remedy at law.(q)

If the bill was properly sustained, there should have been
an issue awarded, that the question of damages might be
ascertained by a jury. An issue is the usual course in such
cases. The only instance in which Chancellor *Kent* has
sustained a bill for a specifick performance, for the mere
purpose of liquidating damages, was in *Phillips* v. *Thomp-
son*,(r) and he there awarded an issue to assess the amount.

*S. Sherwood & P. Ruggles*, for the respondent. The or-
der was, by the new arrangement, to have been delivered
up. To this arrangement the respondent was not a party.
Even before this, the appellant had made the order his own,
by not taking the proper steps to charge the parties, and the
consideration may be considered as paid. But the consid-
eration of $560 did not move from the respondent. It was
given by *P. Bennet* on *Pelton*, and the consideration paid
by the respondent was his deed, releasing all his interest to
the appellant. The cases cited against the right to shew
other considerations than are expressed in a deed, merely
restrain a party from contradicting the language of the deed
as to consideration, but do not preclude him from shewing
additional considerations, especially in a Court of Equity.
Should it be said that the respondent having no title, his re-
lease was, therefore, of no value, we answer, that if the ap-
pellant's covenant to convey had been purely voluntary,
yet equity would enforce it.(s) And the Court will inter-
fere against volunteers in cases of fraud.(t)

To the objection, that setting aside the execution destroy-
ed the title, we answer, that setting aside the execution is not
setting aside the sale, and a *bona fide* purchaser, who is a stran-
ger to the record, is not affected by setting aside an execu-
tion. (17 *John.* 169.) This distinction between a judgment
reversed for error, and proceedings set aside for irregularity,
because one is the act of the Court and the other that of the
party, is confined to the party on the record, or his attorney,
and not to an officer executing the process, or a *bona fide*
purchaser under it. This abundantly appears from the cases

(q) *Hatch* v.
*Cobb*, 4 *John.
Ch. Rep* 560.
*Kempstall* v.
*Stone*, 5 id.
193, and the
cases there ci-
ted.
(r) 1 *John.
Ch. Rep.* 131.

(s) 14 *Ves.*
290. *Colman*
v. *Sarrel*, 1
*Ves. Jun.* 50.
1 *Mad. Ch.*
327. *Atkins* v.
*Farr*, 1 *Atk.*
237. 2 *Eq. Ab.*
247, *S. C.* 1
*Mad. Ch.* 325,
and the cases
there cited.
(t) 1 *Mad.
Ch.* 326. 1
*Atk.* 401.

IN ERROR.
••••••
ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

cited in proof of the rule. These very cases hold that the Sheriff is not liable, as it is not his business to inquire into the validity of the writ, but to obey it.(u) In *Simonds* v. *Catlin*,(v) the purchaser was the attorney of the plaintiff, who is always chargeable with notice of the irregularity upon his own side, and must take the consequences. In *Jackson* v. *De Lancy*,(w) Chancellor *Kent* says, of *Burd* v. *Dansdale*,(x) that " a judgment revived by one *nihil* only, which is the same as no summons, may be set aside for irregularity, or reversed on error; but the irregularity cannot be noticed collaterally in another suit ; and that, even if the judgment should, for that cause, be reversed or set aside, a purchaser at a Sheriff's sale will hold the land." *Bona fide* purchasers ought to be protected, in their titles, upon principles of publick policy ; otherwise the hazard of irregularity would deter bidders at Sheriff's sale, and lessen the chance of property selling at its fair value. The law always supposes the property to have sold at its value, and the defendant is not injured. The money obtained at the sale goes to his benefit, instead of the property. The party, alone, is to suffer, who is guilty of the irregularity. The statute cited,(y) shews the sense of the legislature on this subject, as to the policy and propriety of protecting *bona fide* purchasers. It provides that the purchase shall not be avoided, though the Sheriff may have given no notice of the sale, and gives a remedy in Chancery where there is a defect in title. We admit the purchaser must, in an action of ejectment, shew both the judgment and execution. If the defendant shews the latter to have been set aside, the plaintiff may reply by proving that it was a subsisting execution at the time of the sale.

It is a mistake, to suppose that if the sale is invalidated by setting aside the execution, the respondent's remedy is gone ; for under the circumstances of this case, the appellant will be considered the trustee of the respondent, and his purchasing in the incumbrance was for the benefit of the *cestuy que trust*. All that could be asked, would be a contribution to make the parties equal, according to the original agreement.

(u) 2 *Wils.* 382, 385. 3 *id.* 341. 1 *Levi* 95. *Carth.* 274.
(v) 2 *Caines*, 61.
(w) 13 *John.* 550.
(x) 2 *Bin.* 80.

(y) 1 *R. L.* 505, 503.

IN ERROR.
.......
ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

Not only the adjudged cases, but all the analogies, are against the sale being considered void. No advantage whatever can be taken of an irregularity in an execution, till it is set aside.(z) A *bona fide* purchaser of lands will not be affected by any irregularity of the Sheriff; for instance, his omitting to exhaust the goods and chattels of the party before he sells his land.(a) A Sheriff's deed cannot be impeached by parol evidence that the levy had been abandoned before sale.(b) The proper remedy is by motion to set aside the sale.(c) If an erroneous judgment be given in debt, and the Sheriff by force of a *fi. fa.* sell a term of the defendant, and afterwards the judgment is reversed by writ of error, yet the term shall not be restored, but only the sum, &c. because the Sheriff was commanded, by the writ, to sell it.(d) There is a difference between the sale of a term to a stranger, and a term extended by *elegit*. In the latter case, if the judgment be reversed, the term is void.(1)

The title derived under the Sheriff's sale, then, being valid, whatever the appellant paid was in his own wrong, the respondent was not a party to it, and there is no foundation of an equitable claim for contribution. Besides, a Court of Equity will not interfere to enforce contribution in favour of a wrong-doer.(e) In *Peck* v. *Ellis*(f) the Chancellor says, "I am satisfied the Court has never interfered, when the party seeking its aid is solely and deeply guilty, and was the cause of leading the other defendant to buy an unsound title." That is a strong case to shew that the Court will not order contribution to a wrong-doer.

[Here the counsel examined the evidence as to the defence set up in the appellant's answer, that the respondent consented to the delivering up and cancelling the articles of agreement; and contended that the weight of testimony was decidedly against the answer.]

The respondent ought not to be driven to his remedy at law. He was obliged to go to Chancery, as well to obtain a specific performance, as to seek a disclosure of the fraudulent manner in which the original agreement had been procured and cancelled. In this respect we are fairly within the case of *Phillips* v. *Thompson*.(g)

(z) *Jackson* v. *Bartlet*, 8 John. 365.
(a) *De Forest* v. *Leete*, 16 John. 127.
(b) *Jackson* v. *Vanderheyden*, 17 John. 167, 169.
(c) *id.*
(d) *Drury's case*, 8 Co. 284. *Hoe's case*, 5 id. 91. *Willes' Rep.* 281. 1 *Roll. Abr.* 778, pl. 1, 3. *Eyre* v. *Woodfine*, Cro. Eliz. 278. *Backhurst* v. *Mayo*, Dy. 363. *Bac. Ab. Execution*, (P.) *Manning's case*, 8 Co. 191.
(1) *Goodyere* v. *Ince*, Cro. Jac. 246.
(e) *Lingard* v. *Bromley*, 1 Ves. and Beames, 117. 1 Mad. Ch. 192.
(f) 2 John. Ch. Cas. 136.
(g) 1 John. Ch. Rep. 131.

The case last cited also shews, that if a specifick performance cannot be decreed, the Court will afford relief by decreeing an equivalent in damages.(h) and this Court have decided, that where a party has incapacitated himself from conveying the whole, he should be decreed to convey the part in his power.(i)

There is no change in the respondent's situation; and if the appellant has changed his situation, or the title, it is in his own wrong, of which he cannot avail himself. In *Waters* v. *Travis*(j) the Ch. Justice says, " no man shall be permitted to say to another, he has led him into an error by holding out false appearances ; but the party deceived must bear the loss resulting from that error."

It is not probable, the *Lamberson* judgment will ever be enforced ; but whether it is a subsisting judgment or not, it ought not to vary the decree. The appellant has chosen to take the power into his own hands ; and not only refuses to perform the decree, but sets up a defence, worse than groundless.

An issue of *quantum damnificatus* is not a matter of course, but of discretion. One was granted in *Phillips* v. *Thompson*,(k) where the object was to ascertain what damages the plaintiff had sustained, by the defendant's lowering his mill dam, and also in entering upon his land, &c. digging, &c. making canal, &c. The Chancellor says, " the cases are numerous in which the Court of Chancery has caused damages to be assessed, either by an issue or a Master, at its discretion. I believe the more usual course is, where the damages are not a mere matter of compensation, to award an issue."(l) In that case he deems it most *advisable* to award an issue, but he says, in the same case, " he has no doubt he can cause the damages to be assessed, either by a Master or an issue."(m) Chancery has directed damages to be assessed in either way, at discretion, for nearly two centuries, and at least from 1660, to the present day.(n) Issues, in general, are matters, not of right, but discretion ; and are only granted when things are so equally balanced as to make it difficult to discriminate.

These remarks are also, in some measure, applicable to

**Margin notes:**

IN ERROR.

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

(h) 3 Cranch, 282, S. P.
(i) Waters v. Travis, 9 John. 465.

(j) id.

(k) 1 John. Ch. Rep. 151.

(l) 2 Fonbl. 441.
1 Eq. Cas. Ab. 18 pl. 7. 1 P. Wms. 570. 2 Bro. 341.
(m) 1 Ves. jun. 329. 12 id. 395.
(n) 1 Vern. 189 90. Bac. Ab. Agreement, B.

IN ERROR.
• • • • • • •
ALBANY,
April, 1823.

WOODCOCK
v
BENNET.

another objection, that the Chancellor should have awarded an issue to try the fact of the appellant's having fraudulently cancelled the agreement.

We admit that if a defendant plainly and precisely denies an assertion in the bill, and one witness only proves the assertion as positively, clearly and precisely as it is denied, no decree for relief can be made.(o) But if there is any corroborative circumstance, attaching more credit to the evidence of the witness, and overbalancing the credit due to the denial, a Court of Equity will act upon the testimony of one witness.( p)

The bill charges, "THAT *the defendant, when alone, or in company with P. & P. B. jun. one or both, procured from C. Bingham the agreement, with other papers, and either held or secreted the same, or caused them to be destroyed.*"

Without negativing any fact *directly,* the defendant answers, "THAT *about the 27th Dec.* 1816, *the complainant went to Ithica, and by consent of all the parties, the agreement was taken up and rescinded, the seals being torn off by the express consent and agreement, and in the presence of the complainant.*"(q)

The answer thus sets up new matter; and the appellant has not directly denied any thing, upon this point, charged in the bill, which, as we have seen, is altogether unsupported by testimony.

There was no need of an issue on this part of the case. It is true, where the evidence is so equally balanced, on both sides, that it becomes doubtful which scale preponderates; the Court will direct an issue.(r) But even in such a case, the Chancellor has a right, if he chooses, to take upon himself the decision of every fact put in issue upon the record, though he ought to exercise the right sparingly and tenderly.(s) We admit that a mistake in refusing an issue is cause of appeal ; and the Court of appeal will judge whether they think a contrary course a sounder discretion.(t) But if an issue should have been awarded in this, it would be necessary in every case. A defendant is not entitled to an issue or inquiry to establish a case relied on by his answer, but omitted in proof.(u) The case of *Le Guen* v. *Gouv-*

(o) 2 *Mad. Ch.* 338-9. 1 *Vern.* 161. 3 *Atk.* 649. *id.* 270. Ten Eyck v. Hart, *M. S. in error.*

(p) 2 *Mad. Ch.* 339-40, *and cases there cited.*

(q) *For the bill and answer in these particulars, vid. also post—opinion of the court.*

(r) 2 *Mad. Ch.* 363.

(s) 2 *Mad. Ch.* 363. 6 Ves. 671.

(t) 2 *Mad. Ch.* 363.

(u) Savage v. Carroll, 1 Ball & Beaty, 548.

*erneur & Kemble*(v) settles the rule with great clearness. The proposition deducible from that case is, that where there is *great doubt as to a fact*, the Chancellor usually directs an issue ; but where there is a decided preponderance, an issue is useless. He directs an issue to inform his conscience ; but if that be already informed, an issue is unnecessary. He will set aside the verdict, if against evidence.

No laches are imputable to the respondent. He lived in *Chenango*, remote from the property in question, and, for aught that appears, received no information of the appellant's attempt to defraud him, till shortly before the time of filing his bill. The laches must be gross to be considered as evidence of abandoning a contract, especially where the party calling for a specific performance has no previous duty to perform on his part.(w) Thirteen(x) and 19 years(y) delay have been holden gross laches, and performance refused. But specific performance has been enforced in this Court, after a delay of 16 years ;(z) and it is uniformly enforced where the delay is the result of the defendant's fraud.(a) It is a rule that length of time may bar an equity, but never cover a fraud.(b)

We think the following may be laid down as the result of the decided cases on this subject : " Where there is no act to be done on the part of the covenantee, and no special damage arises to the covenantor, the time of delay becomes immaterial.(c)

On the whole case, we contend, 1. That the respondent is entitled to a release, and conveyance of the *Fall Creek* property, according to the articles of agreement of 30th *Nov.* 1815.

2. That the appellant having, by other dispositions of the property, disabled himself from specifically performing the contract, he ought to pay the respondent the value on the day fixed for the performance, with interest ; and that the decree of the Chancellor ought, in all things, to be affirmed.

The decree in the Court below should be for the complainant with costs. These are uniformly allowed on de-

IN ERROR.

ALBANY, April, 1823.

WOODCOCK v. BENNET.

(v) 1 *John. Cas.* 436.

(w) 1 *Mad. Ch.* 329, and *the cases there cited.*
(x) *id.*
(y) *Moore v. Blake, Ball & Beatty*, 62, 69. *Vid.* 5 *Ves.* 818.
(z) *Waters v. Travis,* 9 *John.* 450, and *vid.* 4 *Br. C. C.* 469. 1 *Pow. on Con.* 268.
(a) 2 *Ves.* 280
(b) 2 *Ves.* 280.
(c) 12 *Ves.* 326. 2 *Schæ & Lefr.* 685. 1 *Atk.* 12. 3 *Anstr.* 924.

IN ERROR.
• • • • • • •
ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

(d) 4 John.
Ch. Rep. 149.
9 John. Rep.
460.

cree for a specific performance.(d)   Besides, this case is stronger than the usual one ; for here is *fraud.*

*J. A. Collier,* in reply.   Cases are cited from *Vesey, jun.* to show that Chancery will not relieve against a voluntary gift.   But these arose upon bills filed by the donor.   The very term *gift* supposes a delivery ; and there is a manifest distinction, recognized by all the authorities, between an executed and executory contract.   The rule is that equity will neither enforce a voluntary contract, nor rescind it when consummated.   The order for the $560 was not (as supposed by the other side) accepted in payment, but as security. We are told that the release from the *Bennets* was a sufficient consideration.   But the property had been sold under the judgment, and they had nothing to release ; or if the title under the judgment failed, we then acquired the title by the mortgage sale.   Which dilemma will the respondent choose ?   But he never had the title.   The deed from *Phinehas Bennet* was delivered as an escrow, and the condition was never fulfilled.   The equity of redemption continued in *Phinehas Bennet.*   Nor is the release mentioned in the articles as any part of the consideration ; and the authorities cited in the opening prove that, for this reason, it cannot be shewn to be a part of the consideration by parol evidence.

(e) 9 John.
450, 465.

(f) 5 John.
Ch. Rep. 193.
(g) 1 John.
Ch. Rep. 131.

But the circumstances of the parties underwent such a change after the contract as renders its enforcement inequitable.   *Waters* v. *Travis,*(e) cited by the respondent's counsel, will not support the position assumed.   There the defendant retaining part of his interest, the complainant offered to accept it in lieu of the whole.   The case of *Kempshall* v. *Stone,* (f) therefore remains unanswered.   The case of *Philips* v. *Thompson,*(g) was a bill to enforce a contract within the statute of frauds, and is put by the Chancellor upon the ground that the party had no adequate remedy at law.   He awarded an issue of *quantum damnificatus.*   But in the principal case, there was a total change as to the title.

The cases cited for the respondent, as to purchases upon judgments afterwards set aside for error, do not apply.   There the purchase is made under a subsisting judgment and execu-

tion; and Lord *Coke* puts it upon the ground, that though the judgment be reversed, the execution, which is a collateral act, remains good. The Supreme Court(h) did no more than to adopt the rule of Lord *Coke*. On reversal of an outlawry, the party is restored to his goods in whosesoever hands they may be found, and by whatsoever consideration, though sold by the King; for, by the reversal, it is as if no outlawry had ever been, and there is no record of it.(i) The Court, in *Eyre* v. *Woodfine*,(j) in comparing this to the case of sales by a Sheriff under a judgment which is afterwards reversed, say it is not like such a case; " for the Sheriff sells it by authority of law to levy the money; and there, if the judgment be reversed, the party shall be restored only to the money, and not to the term, for he *lost it not by the judgment*;" thus recognizing the distinction of Lord *Coke*. The whole extent of the other cases cited by the respondent's counsel is, that the judgment and execution are a protection to the party till set aside or reversed, and that you cannot impeach the execution collaterally.(k) But executions, set aside for irregularity, become nullities, and leave the case as if none had issued.(l) In ejectment, the party may shew the want of a *venditioni exponas*.(m) The case of *Jackson* v. *Vanderheyden*,(n) establishes merely that the defendant cannot shew collaterally in an action of ejectment, that execution was withdrawn before the sale; that the party should have applied directly to set aside the sale. The Court say the *sale*, because this was the only part of the proceedings complained of. The execution was regular.

It is said that public policy demands the protection of the purchaser; but if the sale had been set aside, as intimated in the last case, where would have been the rights of the purchaser? Suppose an execution without a judgment, and a sale in a remote county, where the purchaser could not have access to the record, or suppose the goods of a stranger are seized and sold, the reasoning from public policy equally applies. Yet the purchaser would acquire no title. Why was the execution in this case set aside? It had spent its force. The land had been sold, and, according to the doctrine contended for, the title was irredeemably gone. Why give the defendants in the

IN ERROR.

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

(h) 7 John.
535.
(i) Ognell's
case, Cro. Eliz.
270.
(j) id, 278.

(k) 13 John.
550.
(l) Cassel v.
Duncan, 2
Serg. & Rawle,
58-9.
(m) Lessee of
Porter v. Nee-
lan, 4 Yeates'
Rep. 108. Les-
see of Glancey
v. Jones id.
212.
(n) 17 John.
167-9

IN ERROR.
• • • • • • •
ALBANY,
April, 1823.
⌣⌣⌣
WOODCOCK
v
BENNET.

(o) 2 Bin-
ney's Rep. 80.
(p) 9 Mass.
Rep. 13.

(q) 3 John.
Cas. 60.

(r) Vid. 2
Ball & Beat-
ty, 16.    Com.
Dig. Chance-
ry, 2 C. 8, 2
C. 11. 1 John.
Ch. Rep. 405,
6.    10.    Ves.
305.    1    Ves.
sen. 279. . 13
Ves. 228.    ...

execution the mere shadow of relief, when the substance was denied ? If the purchaser was to be protected at all events, why set aside the execution ? In *Burd* v. *Dansdale*,(o) a *venditioni exponas* had issued irregularly, and the Court allowed the objection to be taken collaterally, and held that the purchaser acquired no title ; and in *Sheafe* v. *Oneil*,(p) the title of a *bonâ fide* purchaser failed for want of a proper return. A purchaser at Sheriff's sale must risque the execution being issued by the authority of the Court.

But the property and the contract were abandoned by the respondent. (Here the counsel considered the evidence upon this point.) In *Ballard* v. *Walker*,(q) the Court held that 4 years having elapsed from the date of the agreement, before the plaintiff gave notice to the defendant that he should insist on the contract, and 5 years before he tendered a performance on his part, they would presume that the parties had rescinded the contract ; and though the defendant had, within a year after the contract, sold the land to another, thereby incapacitating himself to perform it, yet this was holden insufficient to control the legal presumption that the contract was rescinded. In equity, we repeat, the party seeking a specific performance, must shew himself *eager, prompt, desirous.* The aid of the Court will be denied where there is any particular *hardship, surprize* or *mistake,* or if the contract is waived by *parol,* or if the case is *suspicious* or *doubtful,* or become unreasonable by matter *ex post facto.*(r) Could the Court below, in the spirit of these rules, have lent its aid in this case ? Ought not the respondent to have been turned over to his remedy at law, to enforce a claim which was reduced to one of damages alone ?

The only remaining point which we propose to notice in the reply, relates to the extent of the relief granted, and the rule of damages adopted. If a party had covenanted to give a quit claim deed of land heavily incumbered, and upon bill filed for a specific performance, the Chancellor had decreed a deed of warranty, with a covenant against *prior incumbrances,* the good sense of every man in the community would revolt at the decision ; and yet what is

so grating to our ears in the abstract, has been literally done in this case—nay more—a specifick performance being impossible, the Chancellor has proceeded to award damages, as if such a deed with covenants had been executed, and the title had failed. We claim, if full effect is given to the articles, (and we think upon the most manifest principles of equity) that the $560 be deducted from the damages, and that the respondent contribute his proportion of the *Wells* mortgage and the *Lamberson* judgment.

WOODWORTH, J. The first objection is, that the consideration stated in the agreement, has not been paid. So far as respects the order drawn on *Pelton*, this is true. It is equally clear, as a general rule, that the instrument on which a party seeks relief in equity, will not be specifically enforced, unless it be supported by a valuable, or, at least, what equity calls a meritorious consideration. (1 *Mad.* 126. 4 *John. Ch.* 500.)

The appellant cannot, however, rest his defence on this ground ; for having accepted a draft on *Pelton*, he was bound to use ordinary diligence, before any legal or just claim could arise to demand payment of the drawer. It does not appear that notice was given to *Bennet*, or any request ever made afterwards for payment.

Indeed, it is evident the appellant did not consider the order as the source of indemnity. The questionable nature of the title acquired at the Sheriff's sale, shortly after, pointed out the expediency of obtaining title under the mortgage, and to that object his views were directed. He cannot, therefore, now be permitted to resist the respondent's claim, on the ground that the consideration was not actually paid ; when by his laches he has exonerated him, and by the course he pursued, manifested an intention not to consider the first contract any longer obligatory.

I will therefore proceed to examine the question, whether the purchase under the execution vested a valid title in the appellant. The agreement to convey, *had reference only to the title then held,* and cannot be applied to any subsequently acquired.

Valuable or meritorious consideration necessary.

Due diligence not used to enforce the *Pelton* draft.

Order not considered the source of indemnity.

Whether purchase under the execution gave a valid title.

IN ERROR.
........

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

Every material allegation should be put in issue by pleadings.

There is no allegation that the respondent claims relief on the ground that the appellant afterwards procured title by purchase under the mortgage. It is well settled, that every material allegation should be put in issue by the pleadings ; and no interrogatories can be filed, which do not arise from, or relate to some fact charged in the complainant's bill. (*James* v. *M'Kernon,* 6 *John.* 543.) Admitting, however, that the respondent's bill embraced the purchase under the mortgrge, no equity could arise whereby the respondent can claim the benefit of any interest in that purchase ; for it is fully proved that he declined paying any part of the purchase money due on the mortgage, and repeatedly expressed himself satisfied with the title he expected to derive from the appellant ; that he would not exert himself to raise the money, nor give himself any concern on that subject. Having thus voluntarily chosen to repose himself on the title acquired at the Sheriff's sale, he must abide the decision on that title.

If, then, the appellant, at the time, had no title, there is nothing upon which a decree for specific performance can operate. The execution was set aside by the Supreme Court for irregularity, at the *August* term, 1816. Whether this would invalidate the purchase, has not been expressly decided in our Courts.

Sale not avoided where judgment set aside for error.

It is well settled, that where a judgment is reversed for error, the sale under the execution shall not be avoided. (3 *Coke,* 192, *Manning's case.*) The reason given is, that great inconvenience would follow a contrary doctrine, so that none would buy of the Sheriff in such cases, and execution of judgments would not be done. In 8 *Coke,* 284, it was held, that if an erroneous judgment is given, and the Sheriff by force of a *fieri facias,* sell a term of the defendant, and afterwards the judgment is reversed by writ of error, yet the term shall not be restored, but only the money ; because the Sheriff was commanded and compelled by the King's writ to sell it. (2 *Bac.* 506.) The uniform current of authority sanctions this doctrine.

Otherwise as to irregularity.

But there is a marked distinction between judgments reversed for error, and executions set aside for irregularity.

In the latter case, the party is never excused, if the irregularity be such as renders the process void. One case is the fault of the party himself, the other is considered the error of the Court. (2 *Wils.* 385. *Roe* v. *Milton*, 1 *Lev.* 95. *Carth.* 275.) It is held, that by vacating the judgment, it is as if it never had been. (2 *Bac. tit. Execution*, 740. 1 *Lev.* 95.) In *Parsons* v. *Lloyd*, (3 *Wils.* 345,) *De Grey*, Chief Justice, observes, "there is a great difference between erroneous process and irregular, (that is to say void) process. The first stands valid and good until it be reversed ; the latter is an absolute nullity from the beginning. The party may justify under the first, until it be reversed ; but he cannot justify under the latter, because it was his own fault that it was irregular and void at first." This distinction may serve to explain the cause, why a party can be restored to property, sold under an irregular, which is considered *a void execution*. With respect to acts done under it, or any protection derived from it, it is the same as if there had been no execution. Not so on a reversal for error. There the execution is valid to the time of reversal. It confers a right on the Sheriff to sell, and sanctions all legal acts done under it.

But it has been contended, that in either case, the purchaser is equally innocent, and has no knowledge whether there is error or irregularity. This reasoning is undoubtedly plausible, but while we are considering the reason of the rule, it must not be forgotton that the wisdom of the law is attentive to the rights of *all parties*. Would it not be unreasonable (and I will subsequently shew it unnecessary for the purposes of equal justice) to push the doctrine to the extent contended for ? The plaintiff in an irregular execution cannot justify the imprisonment of the body of the defendant, because it is considered void. Why should not his property be equally protected ? If the remedy is only against the plaintiff, who has abused the process of the Court, in many cases, it might be worse than the disease. It is here proper to observe, that the rule setting aside the execution in this case, states the cause to have been for irregularity merely. Such, I believe, is the general form of entry in our Courts,

IN ERROR.
.......
ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

Difference between erroneous and irregular process.

Sale under latter, to an innocent purchaser, may be avoided.

Form of rule setting aside process.

WOODCOCK
v.
BENNET.

Term *irregularity*, what it means.

whether the facts make out a case of *void* or *voidable process.* When, however, the term *irregularity* is used, and unexplained, it must be understood, as in *Parsons* v. *Lloyd*, before cited, and refers to void process. If there had been no explanation of the rule, the execution would have been considered void, and the proceedings under it a nullity. This is well settled in *Read* v. *Markle*, (3 *John*. 523.) In that case, goods had been taken and sold on an execution, which was afterwards set aside for irregularity. It was held that the execution, being irregular, was a nullity, and that the time when the statute of limitations began to run, was from the first taking of the goods, and not from the time when the execution was set aside. In the opinion of the Court, it is laid down, that the case could not be distinguished from that of *Parsons* v. *Lloyd*, and that the execution being admitted to be irregular and unexplained, is to be considered as void.

But the ground of irregularity, in the present case, does appear. The appellant, in his answer, says it was because the execution issued after a year and a day, without *scire facias*. I have not discovered any evidence expressly to prove this allegation. It seemed, however, on the argument, to be a conceded point. The invalidity of the title was contended on that ground. By the testimony of *Phinehas Bennet*, it appears that the appellant informed him the execution was set aside, because the judgment had not been revived against one of the defendants, who had been dead more than a year and a day; and that it was understood, by the appellant, the respondent, and the witness, that the title derived under the sale would not be invalidated by the order of the Court setting aside the execution.

*Benjamin Pelton* testifies, that *Richard W. Pelton* died on the 9*th* day of *December*, 1812. The legal effect of this latter irregularity was not, as I remember, noticed by the counsel : the argument was confined to the former.

On this state of facts, the validity of the sale turns on the question, whether the execution is to be considered as void or voidable, more than a year and a day having elapsed after judgment, and before execution, and there having been no revival by *scire facias*. I am of opinion that, for this cause,

Whether the execution was void, being after year and day.

the execution was voidable merely : that all legal acts done under it, before it was set aside, were valid ; and, consequently, the sale cannot be impeached on this ground.

In the case of *Jackson* v. *Robins*, (16 *John.* 537) the present Chancellor considered the effect of irregularity, where a judgment had not been revived by *scire facias*. The decision was, that it was not competent to urge it collaterally, in an action of ejectment. He observes, " the better opinion is, that if execution issue without any *scire facias*, the sale under it would not be void. It might have been voidable, and liable to have been set aside by the Supreme Court, as irregular. But, until that was done, the title would have stood." It will be seen here, that this was not the point before the Court. The intimation that the title might be affected by setting aside the execution, is rather a suggestion in the course of argument, than the result of any decided opinion formed on the subject. Indeed, if we attend to the definition of voidable process, that it stands good until reversed, and can only be reversed on application of a party to the suit, we shall arrive at a contrary conclusion. A stranger, in such a case, who becomes a purchaser, will be protected. When his title was acquired, the execution was valid. He cannot be affected by subsequent acts, over which he had no control.

In *Jackson* v. *Bartlet*, (8 *John.* 361,) it was held, that though the execution may have issued a year and a day after judgment, without revival by *sci. fa.* it was only voidable at the instance of the party against whom it was issued : It was a good authority for the sale.

So, also, in *Reynolds* v. *Corp & Douglass*, (3 *Caines*, 271) it is laid down, that " if, instead of bringing debt or *scire facias* on the judgment, the plaintiff sues out a *ca. sa.* the Court will set it aside ; but it has often been adjudged, and it is well settled, that the party is not responsible, in trespass, for suing out the *ca. sa.* for that the execution was voidable, only, and was a good justification until reversed. I think, therefore, it may be safely concluded, that this was not such an irregularity as, in any manner, to affect the sale.

IN ERROR.

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

Whether void
by defendant's
death.

The other ground, that *Richard W. Pelton* died after judg-ment, and before execution, presents a question very differ-ent, in its nature and consequences, from the former. This I will briefly consider. The question here will be, whether the execution was not necessarily void, at the time it issued, inasmuch as it directs the sale of a defendant's property, who was not then in existence, without first calling on his representatives, to whom that property, if he had any, must have passed, and who, being strangers to both judgment and execution, had no day in Court to shew that the process was either voidable or void.

If against
goods and
chattels, it
would have
been regular.

If the execution had been against the goods and chattels, only, it would have been regular; for, at the common law, the charge upon the judgment, being personal, survived; so that where there are two or more defendants in a personal action, and one dies after judgment, execution may issue against the survivor, without a *scire facias*. The execution, however, must be taken out against all the defendants; oth--erwise it will not be warranted by the judgment. (1 *Lord Raymond*, 244. 1 *Sal.* 319. 2 *Tidd*, 1029.) The reason given is, that there is no alteration of the record, nor any new party made liable to the execution.

The charge
as to the per-
sonalty survi-
ved against *B.*
*Pelton.*

The charge upon the judgment, as to the personalty, sur-vived against *Benjamin Pelton;* the executor of *Richard* was not liable at law. If he had been, then a *scire facias* had been requisite, to make him a party to the judgment.

Where a *sci.*
*fa.* should, in
general issue,
on a change of
parties.

The general rule is, that where any new person is to be bet-ter or worse by the execution, there *must be a scire facias.* (*Pennoir* v. *Brace*, 1 *Salk.* 319.)

Charge be-
ing on realty,
did not sur-
vive.

In this case, the charge was on the realty, and did not survive; the lands of both defendants were holden, the exe-cution issued against both; the right and title of both were sold, and conveyed by the Sheriff to the appellant. For aught that appears, at the time the judgment was ren-dered, the deceased defendant had equal title to the lot with the survivor. This execution, then, was manifestly irregu-lar, for we have seen that a stranger cannot be affected with-out making him a party.

A *scire facias* ought to have issued against the survivor, to show why the plaintiff should not have execution against him of his goods and chattels, and of his lands and tenements; and against the heirs and terre-tenants of the deceased, to show why the plaintiff should not have execution of the deceased's lands and tenements, without mentioning any goods. (2 *Tidd*, 1033. 2 *Saund.* 72.)

I apprehend the reason why an execution is considered voidable merely, when issued on a judgment where no change of parties is required, and that an execution is void, when issued to charge the lands, after the death of the defendant, without *scire facias*, will be apparent on this further consideration: the term *voidable* implies, that there is a party who may avoid. When issued after a year and a day, and the parties not changed, the defendant may or may not, at his election, raise the question of regularity. The law permits the plaintiff to issue it, and considers it regular at the time of issuing, subject to be defeated, on the application of the defendant. If he apply before execution executed, the sale will be arrested, and all proceedings under it cease; if he lie by until after sale, then, on the principle that the execution is *erroneous process*, and good until reversed, he cannot recover the goods sold: he can only call on the plaintiff for the money recovered. In the other case, the act of issuing the execution was not warranted by law. This forms the substantial distinction between *void* and *voidable* process.

The rule is correctly laid down in *Luddington* v. *Peck*, (2 *Con. Rep.* 702) by *Gould*, Justice: " the irregularity must be in the process itself, *or in the mode of issuing it*; it cannot be irregular when sued out according to the established course of practice." If the state of facts existing at the time the process issued, be such as to render it unlawful, that is sufficient. We are not to understand by appearing irregular on the face of the process, that the irregularity is stated in the writ. It frequently appears by reference to extrinsick circumstances. Thus, a writ tested and returnable out of term, is irregular. When and where the terms are held by law, and how long the Court was in session, is not stated in

IN ERROR.
......

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

An execution cannot be said to be voidable merely, unless there is a party who can avoid it.

He may arrest the sale; otherwise it is valid, if made to a *bona fide* purchaser.

When process shall be said to be irregular, in general.

When irregular *on its face*

IN ERROR.
••••••
ALBANY,
April, 1823
~~~~~
WOODCOCK
v.
BENNET.

the writ; a knowledge of this is derived from other sources, and yet it may truly be said the writ is bad on the face of it. So in the present case, on reading the writ, it does not appear that *Richard W. Pelton* was dead, but the fact was so; knowledge of the fact, is derived *aliunde*.

The execution may be said to be irregular and void; for it directs to levy on the goods and chattels of a person not in being, and for want thereof, to cause the amount to be made of his lands, which may have been held by persons strangers to the judgment, and ignorant of the proceedings. This doctrine is fully recognized in *Morton* v. *the terre-tenants of Croghan*, (20 *John.* 106,) where it is held that a judgment creditor, who proceeds to enforce his *lien* on real estate, if it become necessary for that purpose, to revive the judgment, *must make* all the terre-tenants parties to the *scire facias.*

Independent of adjudged cases, on the distinction of *void* and *voidable* process, it seems to me that to sanction such a proceeding, would be an invasion of one of the great principles upon which our security depends under a government of laws; that no person shall be put out of his freehold, or lose his goods and chattels, unless he be duly brought to answer, or be forejudged of the same, by due course of law. (1 *R. L.* 47.) It is undoubtedly in support of this principle that the cases hold a decided and unequivocal language; not that in case of the death of a defendant after judgment, the plaintiff *may or must* issue a *scire facias,* but as in 2 *Saund.* 6, *n.* 1, *he cannot have execution against the defendant without a scire facias.* So also in 6 *Bac.* 112, *tit. scire facias*, it is laid down, that one who is no party to the record or judgment, shall have *no writ of execution,* but a *sci. fa. for the alteration of the person altereth the process.*

No answer
that one defen-
t was liv-
dan.
It is no answer to say, that one of the defendants was living, who might avoid the execution, and has, in fact, procured it to be set aside. The objection is, that the law forbade the issuing it, so as to affect the representatives of the deceased defendant. The survivor did not represent their rights, nor could he by any act, as co-defendant, surrender them. Neither can it be successfully contended, that this execution was merely voidable as to *Benjamin Pelton;* because, if the doctrine

I have advanced be correct, it follows that the execution, *in* IN ERROR.<br>••••••••<br>ALBANY,<br>April, 1823. *tot*, and not in part, is void.   It is a settled and inflexible rule, that the execution, as issued, must be warranted by the judgment. (2 *Tidd*, 1029.)   Now, if it be shown that this WOODCOCK<br>v.<br>BENNET. execution was, at least, void as it respected *Richard W. Pelton*, it cannot be said to be warranted by the judgment.    I am not aware of any qualification to the rule, by which process confessedly void in one material part, can be upheld and supported as valid for the residue.

If this judgment had been against *Richard W. Pelton* sole- Execution must be tested in life time of defendant. ly, it would not, I think, be urged, that after his death, an execution could, by authority of law, issue in his name, unless it be tested in his life time. (2 *Tidd*, 916. 7 *D. & E.* 20. 1 *Bos. & P.* 571.    *Vid.* 1 *Ves.* 195.)   As the charge upon the judgment does not survive as to the realty, it cannot alter the principle that he is a defendant with others.

The view I have taken is also supported by the act con- The statute (1 R. L. 504, s. 11,) is not in affirmance of common law, but gives a remedy, which did not exist previously. cerning judgments and executions, (1 *vol. R. L.* 504, *sec.* 11,) which gives a remedy to a purchaser of any lands or tenements upon any execution, who shall be evicted *on account of any irregularity in the proceedings, or want of title in the person against whom such execution issued ;* or by reason of any prior incumbrance.   This section is not in affirmance of the common law, but gives a remedy which did not exist previously.

In 8 *Coke*, 192, (*Manning's case,*) before referred to, it is expressly laid down as one of the reasons why the sale of a term sold under a *fieri facias* shall not be avoided, though the judgment be afterwards reversed, that the vendee would lose his term and money also.  If, then, the purchaser would be without remedy at the common law, in the event that the sale became void on a reversal for error, it seems to me he would be equally so, where the proceedings are set aside for irregularity.   The statute, then, came in aid of the common law, and provided a remedy not existing before.   But the statute does not provide for cases where judgment is reversed for error, evidently, because the purchaser was already protected.   It does provide for the case where the purchaser shall be evicted, on account of any irregularity in the

IN ERROR.
.......
ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

The word *irregularity* in statute, refers to *void*, not *voidable* proceedings.

proceedings, thereby adopting the distinction I have endeavoured to establish, and recognizing the principle that a purchaser will be affected by it, that he may be evicted on that ground, and, therefore, his money ought to be restored.

I have shewn, that where an execution is set aside for irregularity, without further explanation, the term implies *void*, not *voidable* process. When the same term is made use of in the statute, and that statute is remedial, it must be understood in the same sense. This construction, which I consider sound, does not reach the case of a sale under voidable process. The reason is obvious. The purchaser in that case could not be disturbed; the common law protected him. A statute provision became unnecessary.

On the whole, I feel myself bound to say, that although it is not practicable to lay down a general rule, applicable to all cases, drawing the partition line between writs void and voidable, it seems to me clear, that on principle and authority, this execution was void, and if so, no title was acquired by the appellant. To decree a conveyance, would be a nugatory act, and consequently, the respondent's bill, on this ground, ought to be dismissed.

Were the articles rescinded?

But admitting I am not correct in this conclusion, a further question presents itself, whether the articles of agreement were rescinded by the consent of the respondent. Before I attempt to analyze the testimony, it will be useful to inquire how far the answer of the appellant is to be considered evidence.

What the bill calls for on this head.

The bill calls on the appellant to answer the matters alleged, as to making the contract, how it was disposed of, when, where and how the appellant got possession of the agreement, and under what pretences.

And what is answered.

The appellant answers, that the respondent voluntarily concluded to abandon his possession of the premises, and all claim or title thereto, stating that he would have nothing further to do with it, and expressly authorized the appellant to make any arrangement with *Phinehas Bennet* and *Phinehas Bennet, jun.* the appellant thought proper, with respect to the premises; that afterwards, on or about the 27*th December*, 1816, the complainant came to the village of *Ithica*,

and by consent of all the parties, the articles of agreement between the defendant and the *Bennets* were taken up and rescinded ; the seals being torn off by the express consent and agreement, and in the presence of the complainant.

This part of the answer is legal and competent evidence, because it is responsive to the bill, and within the discovery sought. There is undoubtedly some apparent contradiction in the *English* authorities on this point.

In *Gilbert's Law of Evidence*, 45, before Lord *Cowper*, the bill was by creditors for an account, and it was ruled, that when the answer was put in issue, what was confessed need not be proved, but the defendant must make out by proof, what was insisted upon by way of avoidance. But in 1 *Vernon*, 136, 208, it was decided, that if a man, by answer, swear that what he received as a servant, he paid over to his master, he shall not be put to answer again.

Whatever may be the rule in the *English* Courts, this question is at rest with us. In *Clason* v. *Morris*, (10 *John.* 542,) a replication had been filed to the answer, and witnesses examined. The material inquiry was, whether the answer had been disproved. *Thompson*, Justice, in his opinion, observes, " the respondents having thought fit to make the appellant a witness, they are bound by what he discloses, unless it is satisfactorily disproved. The answer is not to be discredited, or any presumption indulged against it on account of its being the answer of a party interested." This rule applies to every case where the answer is within the discovery sought. The same principle is recognized in *Field* v. *Holland*, (6 *Cranch*, 24.) In the bill, the complainant called on the defendant to answer, whether certain judgments were discharged. Having answered as to this fact, which was material for the defendant, Chief Justice *Marshall* observes, " the plaintiffs cannot now be allowed to say that this answer is no testimony." But the question has been decided in this Court, in 1817, in the case of *Ten Eyck and others* v. *Hart*. How far the answer was evidence, was one question before the Chancellor. On the appeal, it was argued and decided here. On the debit side of the defendant's account, some of the items were not supported

IN ERROR.
.......
ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

Answer legal evidence. *English* authorities.

*American* authorities.

*Ten Eyck* v. *Hart*, M. S. 1817.

by proof, unless the answer was evidence. It was argued that it was evidence, because it was responsive to the bill. The defendant was interrogated, and required to set forth an account of all just debts owing by the intestate, and how and in what manner his estate had been applied or disposed of. By the 4th section of the decree in this Court, it was among other things decided, that the charges contained on the debit side of the account be allowed, unless disproved or falsified by the respondent. A division of the Court was taken on this section. This decision is in point, as to the case under consideration ; for the answer of the appellant here is not more than a fair compliance with the interrogatory in the bill.(a)

(a) The decision of this case, in the Court below, is reported, (1 *John. Ch. Rep.* 62) and was afterwards reversed in the Court of Errors, upon the point taken and discussed by the Chancellor, at p. 87 to 94, and p. 91 to 93, *note (a.)* The decision by the Court of Errors was not reported ; but the following extract from Mr. *Emmet's* argument, who was of counsel for the appellants, will shew the limitations within which the doctrine was contended for on that occasion. Notes of this argument were preserved, and furnished to me, by a gentleman of the bar, who was present at the hearing.

" A preliminary question is made, as to the force of the answer. We contend that where it is a direct and proper reply to the interrogatories of the bill, it is, *prima facie,* evidence for the defendant, if in his favour ; and our adversaries contend that, where the answer affirms a matter in avoidance, the defendant must prove his affirmation. So far as the two positions are not in collision, we admit the truth of theirs, and it would be universally true if qualified by ours : that the defendant must prove his affirmation, unless it be a direct and proper reply to an interrogation of the complainant. When that is the case, the moral rule of evidence does not apply. The complainant could not have been compelled to assume the proof of the negative, but he has voluntarily undertaken to do so. He has, of choice, assumed the *onus.* In order to prove that negative, he has voluntarily appealed, for evidence, to the defendant's oath, and having done so, he must let the evidence which he has thus elicited be taken into consideration, in the general mass of testimony. This demand, on our side, is supposed to arise from confounding the course of the Court of Chancery, and from not adverting to the difference between pleadings and evidence. Whether that distinction be properly applied by Mr *Evans* to the observations of *Peake*, (vid. 2 *Evans' Poth.* 156-8, *considered in* 2 *John. Ch. Rep.* 90, 91) will be presently seen. But, for the present, let us examine whether an answer is to be considered, in Chancery, in all its parts, as *mere*

IN ERROR.
.......
ALBANY,
April, 1823.
WOODCOCK
v.
BENNET.

As to *Phinehas Bennet* and *Phinehas Bennet, jun.* the articles were undoubtedly cancelled ; for on the same day *they* enter into a new agreement with the appellant. The evidence relied on to disprove the answer, is by showing that the respondent was not at *Ithica* on that day, nor had been

*pleading.* It is perfectly settled, that when it explicitly denies any matter necessary to the complainant's equity, no decree can be had against the denial, unless on the oaths of two witnesses, or of one confirmed by strong circumstances. Is that privilege the mere fruit of pleading, or what a defendant would have if he pleaded the general issue, or traversed any particular averment in a plaintiff's declaration ? Why has the defendant that privilege in Chancery ? Because his answer, when responsive to the bill, is a piece o. evidence even in his favour, and a decree shall not be had against him, unless the complainant make out his case by a preponderance of evidence. It is not true that either a bill or answer are, of necessity, mere pleadings. A bill is certainly, in part, a pleading ; and it is, or at the election of the pleader may be, an examination of a witness by interrogatories. The answer is a mere pleading, so far as it sets up new and distinct matter of avoidance to defeat the plaintiff's equity It is pleading coupled with evidence, when it denies the complainant's statement, on which his equity is founded. It is mere evidence in every other respect. The complainant, in the formation of his bill, has his election to make as much or as little use of the defendant, as a witness, as he pleases, except that by the course of the Court he must receive the direct denial of his allegations by the defendant, as evidence as well as pleading. Nor is there any hardship in this. If he has sufficient and convincing proof, he may overcome the defendant's evidence in his own behalf. If he has not, no Court can give him relief. But whatever may be thought of this part of the rule, its existence is incontrovertible. There is, however, more justice in giving to the defendant the benefit of those parts of the answer which are mere evidence, because the extent to which they can go must entirely depend on the complainant's election. Such responsive affirmations, on the part of the defendant, can only arise out of the charging part of the bill, which sets forth what are supposed to be the defendant's pretences, or from the breadth of the interrogatories. Neither of these are necessary parts of a bill. Formerly the bill contained very little more than the stating part, with a simple prayer that the defendant might answer the matters contained in it, and then came the prayer for relie·. (*2 Mad. Ch.* 136-7.) It is manifest that, in a bill thus framed, a complainant can encounter no difficulty from the defendant's oath, but a denial of his equity. The other parts are voluntary, and only calculated to elicit evidence. They are, therefore, often dangerous, and perhaps imprudently used. As to the pretences, or charging part, it is mentioned that Lord *Kenyon* never inserted this part in any of the bills which he drew when at the bar. (*Partridge v. Haycraft,* 11 *Ves.* 574-5. *2 Mad. Ch.* 137.) The interrogatories,

for a considerable time previously. The appellant states, that previous to the *27th December*, 1816, the respondent abandoned all claim or title. This is the material allegation, which is not disproved, unless by proving that the respondent was not in *Ithica* on the *27th*, the appellant is con-

which are merely calculated to get the defendant's evidence, may undoubtedly be restricted by the pleader's prudence. Where the complainant has such entire control, as to the extent of the defendant's answer, with what truth can it be said, that to allow his answer, where it states an affirmative fact, precisely in reply to the complainant's bill, to be, *prima facie*, evidence, " would render it absolutely dangerous to employ the jurisdiction of the Court of Chancery, inasmuch as it would enable a defendant to defeat the complainant's just demands, by the testimony of his own oath, setting up a discharge or matter of avoidance?" (*Words of the Chancellor, in this cause*, 2 *John. Ch. Rep.* 90.)

The cases put by the opposite counsel are only fancied dangers, or such as are necessarily incident to the course of evidence. They suppose the complainant without any evidence to support his case at law; and then complain of the monstrousness of letting the defendant swear away the complainant's just rights. What remedy is there for this, where not a step can be taken without the defendant's oath? The same objection may be made against *all testimony on oath*, which certainly opens a door to perjury. But in the cases stated by the opposite counsel, the utmost their rule would do, would be to make an unconscientious defendant shift the bearing of his false oath, and deny the receipt of the goods or money, instead of averring payment. The privilege of denying, equally holds out an inducement to perjury. In those cases, it is the choice or ignorance of the complainant's pleader only, that can afford the defendant such an opportunity. If he does not choose to appeal to the defendant's oath, he may shape his bill for effectual relief, without enabling him to make any affirmative averment, which would be evidence. But he must always take the risque of denials. He may state his case, and pray that the defendant be decreed to come to a fair account with him; and then every thing will be transacted by charge and discharge, and proofs before the Master. A doctrine contrary to what we contend for, would stretch the defendant's conscience on a moral rack, and receive nothing for proof, but confessions of guilt.

The limitation that the defendant can only discharge himself by oath, of sums under 40 shillings, is urged against us, as being an exception which proves the complainant's rule. But that is a defendant's privilege, which he may insist upon in support of a new matter of avoidance set up by himself, without being responsive to the complainant's bill. So also is the rule as to menial servants. (*Potts* v. *Potts*, 1 *Vern.* 208.) There the answer is available and conclusive, though not responsive to the bill; and neither are exceptions which prove the complainant's rule.

IN ERROR.
.......
ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

sidered as swearing designedly false when he asserts the respondent came on that day.

It will be kept in mind, that the appellant swears positively, respecting a transaction that must have been familiar to him, and so important, as not readily to be forgotten. Indeed, in the judgment of charity, I perceive no room to escape the imputation of false swearing, if his answer, in this respect, is not substantially true.

His Honor, the Chancellor, observes, " there are five witnesses on the part of the plaintiff, who declare positively, that the plaintiff was not in *Ithica* between the 1*st* of *December*, 1816, and the 25*th* of *January*, 1817, and that the proof utterly destroys the credit of the answer." After a very attentive perusal of the case, I have not been able to arrive at the same conclusion. It may be somewhat tedious to examine critically the testimony of each witness. My apology must be, that we are called on to decide a question of fact, and the occasion renders it indispensable.

The first witness, *Phinehas Bennet*, says, he is confident the complainant was not in *Ithica* between the 1*st* of *December*, 1816, and the 25*th* of *January*, 1817. The witness resided on the *Fall Creek* property, near *Ithica*, and the complainant at *Chenango*, a distance of 40 or 50 miles. It will not be pretended, that the witness meant to express any thing more

*P. Bennet's* evidence for the respondent

The cases cited by the Chancellor, and the controversy alluded to between *Peake* and *Evans*, (see 2 *John. Ch. Rep.* 90, 91,) are all beside this question, and treat on an entirely different position. They allude to a rule contended for in analogy to courts of law, (where it is certainly established) that the answer being an entire instrument, if the plaintiff read any part of it in evidence, his doing so, will entitle the defendant to read the whole, and that without any regard to the point whether the matters read are, or are not responsive to the bill. The propriety of this is manifestly the subject of discussion between *Peake* and *Evans*. The distinction between the two courts is too firmly settled to be disputed, though many may question its propriety ; but the proposition is entirely different from ours."

Here the counsel examined the authorities cited by the Chancellor, (2 *John. Ch. Rep.* 87 to 91, and in note (*a*) at the last page.) And in addition to those cited by Mr. Justice WOODWORTH, in the principal case, he cited *Maupin* v. *Whiting*, (1 *Call*, 224-226,) and *Snellgrove* v. *Baily*, (3 *Atk.* 214.)

than his belief. He had no actual knowledge of the fact. The reasons for this belief, are given, 1. Because the complainant removed from his residence in *Ithica*, to the town of *Chenango*, about the 31*st October*, 1816. 2. Because the witness did, during this period, urge the complainant by letter, to come to *Ithica*, but that he did not arrive before the 1*st February*, 1817. And 3. Because the witness believes that if the complainant had been in *Ithica*, he, the witness, could not have failed of becoming acquainted with the fact.

Is inconclusive and unsatisfactory.

This testimony is altogether inconclusive and unsatisfactory. It raises no more than a slight presumption, which the law cannot regard. It cannot rank so high as mere negative testimony. The life, liberty or property of no man in the community would be safe, if a witness swearing positively to a fact, could be discredited in this manner. To show how little reliance can be placed on the accuracy of this witness in detailing facts, I refer to his answer to the defendant's tenth interrogatory, where he says the letter he wrote to the complainant, urging him to come to *Ithica*, was written about the last of *January*, 1817 ; and yet we find in answer to the complainant's 8th interrogatory, the writing of this very letter, and the complainant not arriving in consequence of it, before the 1*st February*, assigned as the ground of his belief, why the complainant was not at *Ithica* previous to the 25*th January*. In other words, the complainant could not have been at *Ithica* on the 27*th December*, because the witness, a month afterwards, urged him by letter to come. However this may strike other minds, I cannot consider it entitled to any weight, or proving any fact that discredits the answer.

*P. Bennet, jun s.* evidence for the respondent is of the same character.

The testimony of *Phinehas Bennet, jun.* is of the same character as the last. He testifies truly to what he knows, but the fact, within his knowledge, is of little consequence. He is confident the complainant was not in *Ithica* between *November* and *February*—Why ? Because the complainant made his home at the house of the witness' father, whenever he came to that neighbourhood ; and if he had been in *Ithica* during that period, the witness would have known the fact. This is the substance of his answer

to the defendant's cross interrogatory. He does not recollect, or know that the complainant was in *Ithica*. I should consider it a waste of time in attempting to show the irrelevancy.

*Charles Sprague*, says he is confident the complainant was not in *Ithica*, but was living in the family of the witness at *Chenango*. *He is induced so to believe*, because he assisted in removing the complainant three weeks before the birth of his child, which was on the *5th December*, 1816, and afterwards set out for *Ithica*, in company with the complainant, on the *31st January*, 1817 ; that he does not recollect, or believe that he was absent from the county of *Broome*, at any time after he came to reside in the witness' family, until the *31st January*. The first suggestion that occurs to me is, that this witness is speaking of occurrences that took place between 3 and 4 years previous to his examination. There does not appear to be any reason given for the witness' belief that the complainant was not at any time within the space of two months absent from the county of *Broome*, excepting that he resided in the family of the witness. It would be going very far to say that any thing like certainty could be inferred from belief founded on this fact. I admit, it may probably be correct, but nothing more.

The fallibility of memory alone, in relation to past transactions, in which a witness has no interest or concern, and where there is no circumstance to make a strong impression, abundantly proves what little reliance can be placed on the recollection of particular dates. I apprehend the case becomes materially weakened, when a witness undertakes to extend his belief to so considerable a period as the present. It will not, I presume, be seriously urged, that because the complainant removed from *Ithica* in *November*, and went in company with the witness to that place on the *31st January*, that, therefore, he could not have been in *Ithica* at some intermediate time, without the knowledge of the witness. It would require a mass of testimony of this description to overbalance a fact proved affirmatively by one credible wit-

IN ERROR.
. . . . . . .

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

C. *Sprague's* evidence for the respondent.

Where there is no circumstance to make a strong impression, little reliance can be placed on a witness' recollection of particular dates, several years before he testifies.

IN ERROR.
•••••••

ALBANY,
April, 1823.

WOODCOCK
v
BENNET.

A seeming conflict of evidence should be scrutinized strictly, to see if it is susceptible of explanation, or incapable of being reconciled.
. It it is intrinsically of a negative character, it does not necessarily destroy what is testified affirmatively.
And if one fact is not wholly inconsistent with another, it may well be considered that each witness has spoken truly.

P. Brown's evidence for the respondent.

S. C. Bennet's evidence for respondent.

ness, and with respect to which there could not well be unintentional mistake.

Where there is a seeming conflict of evidence, it is the duty of the Court to scrutinize it strictly, to ascertain whether it is susceptible of explanation, or incapable of being reconciled. When the testimony is intrinsically of a negative character, it does not necessarily destroy what is testified affirmatively. The question always is, whether one fact is wholly inconsistent with the other; and if not, it may well be considered, that each witness has spoken truly. Had the witness in the present case given some more satisfactory reasons for the confident opinion and belief he has expressed, it would, at least, have been advisable to have gone a step farther than the single fact, that the complainant resided in the witness' family. The correctness of the witness' opinion would have been more apparent, had he proved that he also had been continually at his own residence, during the period enquired of, and therefore possessed the means of knowing that the appellant had not been absent from his house a sufficient time, between November, 1812, and 27th January, 1817, to admit of his going and returning from Ithica to Chenango.

The next witness is Pitts Brown, who gives his opinion that the complainant was not at Ithica. He is induced so to believe, because, on the 23d January, he transacted business at Chenango with the complainant, who afterwards arrived at Ithica on the 25th of the same month. All this I have no doubt is true ; but how it is opposed to, or discredits any thing asserted by the appellant, I have not been able to discover.

Silas C. Bennet, a son of the complainant, aged 19 years, speaks positively, that the complainant was not at Ithica in December, 1816 ; that the witness resided with the complainant, and that neither the witness nor the complainant was absent from the town of Chenango. This testimony is positive and contradicts the answer. It cannot, however, escape observation, that the witness is speaking of a fact of such a nature, that mistakes may easily exist and be accounted for in a manner consistent with the utmost good faith.

No circumstance is stated from which we can infer he noticed the time his father remained at home, or why this fact seemingly unimportant at the time, was impressed on his memory. If there were none, is there not just cause to suspect mistake? Is not the frailty of memory such as to transient events long since past, that the most positive evidence as to dates ought to be considered as liable to some uncertainty? Those who have attended to the subject in our Courts of justice would, I think, answer this question in the affirmative.

His Honor, the Chancellor, places great stress upon the testimony of *Charles Bingham*, as positive, direct and authentic, that the original articles were procured and retained and cancelled by the appellant, fraudulently, *and that the respondent never consented to surrender them.*

I will subsequently examine the charge of fraudulently cancelling. I am now considering the evidence on the question whether the respondent consented to rescind the articles; and so far from saying any thing on that point, *Bingham* does not profess to have any knowledge. He says he never was authorized, by the complainant, to give up the paper to be cancelled; nor does he know whether the same was given up by the complainant, to the defendant, for that purpose, or by any other person acting under his authority. The answer to all this is, that the appellant has no where asserted that the respondent authorized the witness to give up the paper to be cancelled. He states as a fact, that the articles were rescinded by the consent of the appellant. Before the testimony of *Bingham* can be entitled to the character ascribed to it, it will be necessary to show that the complainant could not personally, by agreement with the appellant, as effectually rescind his contract, as if done through the medium of *Bingham*, the witness. He states one other fact: he did not see the complainant in *Ithica* during the period mentioned.

I have thus carefully examined the complainant's proof. The result is, that *Silas C. Bennet* and *Charles Sprague* contradict the answer; but neither the testimony of the two *Bennets*, of *Pitts Brown*, nor of *Bingham*, impeach it, as to

IN ERROR.

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

Frailty of memory is such as to transient events long since past, that the most positive evidence as to dates, ought to be considered liable to some uncertainty.

2 witnesses contradict the answer; The other 4 do not impeach it.

IN ERROR. the question whether the complainant was in *Ithica* at the time alleged.

ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

Answer supported by *E. Brown* & *J. H. Avery.*

The answer is supported by the testimony of *Emery Brown*, that he saw the complainant in *Ithica* on or about the 25*th December*, 1816 ; and of *John H. Avery*, who says that, in the fall of 1816, he was applied to by the appellant to assist him in raising specie ; that soon afterwards he met the appellant and *Phinehas Bennet* in *Ithica*, and at that time, or some period previous to the mortgage sale, which was on the 11*th Janua. y*, 1817, he was informed by a person whom he then supposed, and now believes, was the complainant, that he had abandoned and removed from the property, and, from his inability to pay, had given up the property to his brother, *Phinehas Bennet*, and the appellant.

Answer supported by 2 witnesses; and not assailed successfully by more than 2; therefore the respondent's consent to abandon, &c. and rescind, &c. is proved by legal and competent testimony.

The answer, then, is supported by two witnesses, and not assailed successfully by a greater number. Consequently the fact is proved by legal and competent testimony, that the respondent abandoned and rescinded the agreement.

It may be further observed, that the fact of cancelling, alleged in the answer, is in perfect accordance with the declarations of the respondent, made at different times, and removes every thing like suspicion that this defence is fabricated for the purpose of fraudulently resisting a just claim. To *John H. Avery*, the respondent declared he had given up the property to his brother and the appellant ; to *Abner H. Howland* he declared, shortly before his removal to *Chenango*, that he was determined to abandon the *Fall Creek* property, and would have nothing further to do with it. He did remove and remained silent a long time thereafter, until title was procured under *Pelton's* mortgage, until extensive improvements had been made, computed at not less than $5000, and until *bona fide* sales had been made to different purchasers. These facts speak a language not to be mistaken. It cannot be matter of surprise, that after this the parties should have cancelled the agreement. It would have discovered in the appellant great inattention to his interest, had it not been done. To decree a specific performance against such facts, would be opposed to the principles of equity, and sanction positive injustice.

IN ERROR.
. . . . . . .
ALBANY,
April, 1823.

WOODCOCK
v.
BENNET.

With respect to the manner in which the appellant obtained the papers from *Bingham*, I do not perceive how that can affect the decision of this cause; because the respondent, having a copy of his contract, admitted to be correct, is entitled to the full benefit of it, equally as if the original had remained in *Bingham's* hands. The subsequent arrangements with two of the *Bennets* did not impair the respondent's rights.

*Bingham* testifies, that the appellant called on him in *November* or *December*, 1816, for the purpose of obtaining copies; that the papers were delivered to the appellant, and afterwards returned as he supposed; that afterwards, in 1817, the appellant and *Phinehas Bennet* called for the papers; and he delivered them as he then thought.

C. Bingham's evidence.

*Phinehas Bennet* testifies, that he went with the appellant to *Bingham's* office, the last of *December*, 1816, or the beginning of *January*, 1817, to procure the papers; that *Bingham* delivered a bundle to the appellant, but on examining, it was discovered, that none of them were signed or sealed : upon which, the appellant made further search for the quit claim or release, but whether the same was then discovered or obtained, he does not know; but that on the *29th July*, 1820, the appellant exhibited a paper, which, from the appearance of the seals and signatures, he recognized as the original agreement.

*Bingham* says, that on the *31st July*, 1820, the appellant showed him the original agreement; that the seals had evidently been torn off, but not the signatures. From this rather obscure statement, it does not clearly appear whether the appellant took with him the original agreement, when he called alone, or whether it was afterwards taken, when he called with *Phinehas Bennet*. I think it is to be inferred, that the appellant must have taken the original when he first called on *Bingham*, which was probably early in *January*, 1817, and before the mortgage sale; because it was not found when the appellant called with *Bennet*. He testified, that on examination, none of the papers had the appearance of originals. He went away under the impression that none had been found in consequence of the search.

If this be so, it places the conduct of the appellant in a censurable point of light with respect to *Bingham*, the depositary, the permission being to take a copy, and return the original. It was also trifling with *Bennet* to go in search of a paper, already in his possession. Had any fraud been attempted, in consequence of this seemingly improper conduct, I should concur with his Honour, the Chancellor, in turning every presumption, and every unexplained circumstance against him. But it may be enquired, what could have been the inducement for so disingenuous a course? It will be recollected, that at the time the appellant first called, if the view I have taken of this cause be correct, he was entitled not only to the possession of the paper, but also to cancel it, so far as the respondent was concerned. He had previously rescinded the contract. When *Phinehas Bennet* called with the appellant, it was after the new agreement of the 27*th December*, 1816, was made, between the appellant and the two *Bennets*, by which the former contract was virtually rescinded, so far as they were concerned, provided the appellant bid off the *Fall Creek* property on *Wells'* mortgage. This was done on the 11*th January*, 1817, and thereby the condition became absolute. All this took place before the search spoken of by *Bennet*; for *Bingham* swears it was in the year 1817, when they called on him, leaving scarce a doubt, that it was after the sale of the mortgaged premises. Here, then, there was no necessity of resorting to artifice, or motive for concealing the first agreement. That there may be some misapprehension, on this immaterial point, I think highly probable, but deem it unnecessary to pursue the inquiry further.

At any rate,
the   decree
should   be
modified,   so
as to make the
respondent
account   for
1-4 of *Lam-
berson's* judg-
ment, &c.

If the respondent could surmount the preceding difficulties, which lie in the way of his recovery, the decree ought to be modified in one particular only. It will be seen, that the judgment of *David Lamberson* against *Benjamin Pelton*, was docketed the 8*th December*, 1807, prior in point of time to the judgment of *Walter Wood*, or the mortgage of *Wells*. The Chancellor directs the Master to report the value of the undivided fourth part on the 1*st December*,

1816, exclusive of subsequent improvements, without making any deduction on account of this incumbrance. I think the equal fourth part of that judgment, with interest and costs, ought to be deducted from the amount of the Master's report, and secured in such manner as the Chancellor may direct, to be applied in discharge of one fourth of the amount, finally ascertained to be due on the judgment. The respondent is not entitled to relief, unless the appellant's purchase, under the execution, vested a valid title. He appears to be in no way connected with the subsequent measures to obtain a title under the mortgage, and declined making any advances to discharge it. This step must be considered as the prudential act of the appellant to strengthen a title, considered by him questionable. If it turns out, that no such expedient was necessary, but that the title was perfect without it, the respondent is not liable to contribute to the loss. On this principle, it seems to me the question of laches does not arise. The respondent will receive no more than the value at the time his deed was to be given. He does not avail himself of subsequent improvements. His omission to assert his right for several years, could have no influence on the appellant.

But it has been contended, that if the respondent is entitled to relief, an issue ought to have been awarded, to ascertain the amount of damages. It seems to be well settled that the Court of Chancery will not, except under very particular circumstances, if the party be not entitled to a specifick performance, direct an issue of *quantum damnificatus*, or a reference to a Master to ascertain the damages. If a party elect that remedy, he must resort to law ; but where the defendant has put it out of his power to perform the contract, the bill will be retained, and it will be referred to a Master to assess the damages. This was decided in *Denton* v. *Stuart*, before Lord *Kenyon*, Master of the Rolls, sitting for the Chancellor. (1 *Fonb.* 38, *n. y.* and 165, *n. b.*) The general rule is otherwise. Mr. *Fonblanque* observes, " I am aware of no other case, in which such an order has been made, the usual decree being, either a specifick performance, or an issue of *quantum damnificatus.*"

IN ERROR.

. . . . . . .

ALBANY,
April, 1823..

WOODCOCK
v.
BENNET.

Reference
was proper.

Lord *Eldon*, in speaking of the case of. *Denton* v. *Stuart*, says, " that case, if not supported on that distinction, is not according to the principles of the Court. (17 *Ves*. 276. 1 *Mad*. 350. 12 *Ves*. 395.)

I incline to think, that the reference in this case was proper to ascertain the quantum of damages, the appellant not having it in his power to convey the one fourth. The result of my opinion is, however, that the execution being void when it issued, the appellant's purchase at the Sheriff's sale vested no title ; and secondly, whether void or not, the agreement to convey was rescinded and cancelled by the consent of the respondent, and therefore, on either of those grounds, the complainant's bill ought to have been dismissed ; and, consequently, the decree of the Court below should be reversed.

This being the unanimous opinion of the Court, it was thereupon ORDERED, ADJUDGED and DECREED, that the decree of his Honor, the Chancellor, be *reversed*, and that the bill of the respondent be dismissed with the costs in the Court of Chancery ; and that each party pay his own costs on this appeal.

END OF APRIL SESSION.