Mr. Chief Justice Sharkey
delivered the opinion of the court.
This case is presented to us on a motion to supersede the order of the chancellor appointing a receiver. The chancellor also made a final decree, from which respondents appealed, so that the whole case on its merits is in this court by appeal. It is agreed that if it should become necessary for the court to investigate the merits on this motion, the decision will be regarded as settling the whole controversy, and the case has therefore been argued at length on the whole of its merits.
The record is very voluminous, and has necessarily required much time in the examination. The complainants in the court below had recovered judgments at law, for very large amounts, against the Mississippi and Alabama Railroad Company, a corporation generally known as the Brandon Bank. Executions issued on these judgments, which were levied on a number of negroes, by the sheriffs of Rankin and Hinds counties. William Petrie claimed the negroes, and gave bond to try the right at law, but before the trial the complainants filed their bill, seeking *702 to transfer the controversy to the superior court of chancery, and, by the aid of that court, to have the property subjected to the satisfaction of their executions, on the ground that the company had an equitable interest in it. It is charged in the bill, that Petrie’s claim originated in a fraud so complex, that the aid of a court of chancery is necessary to detect it; that the directors, who are made defendants, managed the affairs of the bank in a faithless manner, and used it as the means of acquiring fortunes to themselves, the negroes in question constituting a part of the property of the bank, and that they combined with Petrie and others to create false claims and titles to the property thus acquired, that they might abstract it from the creditors. To accomplish this object, they had combined with Petrie to defeat the title of the bank, by causing the books to be sent away or mutilated so as to destroy the evidences of fraud; that Shelton and Petrie also used their influence in sending off witnesses, so that a fair trial could not be had at law; that these negroes were purchased with the money of the bank, but subjected to Petrie’s claim under pretended articles of agreement entered into between Petrie"and the bank, in reference to the construction of a railroad from Jackson to Brandon. The substance of the agreement is set out, and it is made an exhibit to the bill. It is also alleged that when this contract was made, ’Petrie was very poor, and that he purchased the negroes with the money, or on the credit of the bank, and instead of investing $100,000, he laid out $159,000 for negroes, paying nothing out of his own pocket; that from poverty he arose to affluence without paying anything. The bank has paid Petrie $442,755, or about $238,755 more than the amount the road was to cost, no part of which has been finished; Petrie worked about two years, and then abandoned the road entirely; that Petrie’s claim being fraudulent, the property is subject to the mortgage which he agreed to give. The prayer is, that an account may be taken between Petrie and the bank, and after allowing him a fair compensation for his labor on the road, that he be decreed to pay the balance to the complainants, and that the mortgage be foreclosed ; that the contract be set aside, and for such other and *703 further relief as the complainants may be entitled to. There is also a prayer that the defendants may each answer all the allegations of the bill, and also the special interrogatories propounded, thirty-one in number.
Petrie, in his answer, denies all fraud; admits that he purchased the negroes with money furnished by the bank, as it was bound to do under the contract, and avers that he purchased them as his own property, and paid the amount advanced him by work on the railroad ; he admits that the road is still unfinished, but says that it is owing to the fault of the bank in not furnishing funds as it was agreed, and in not procuring the right of way; that he was anxious to have completed the road, but was prevented from doing so for want of the necessary funds, and by landholders on the road, who had not received anything for the right of way. He denies that he received the amount stated in the bill, or more than he was entitled to, and exhibits his account with the bank, by which it appears that he received $298,021, which sum he avers was mostly paid in the issues of the bank, then much depreciated, and that he suffered great losses in consequence thereof. He finally relies on a settlement with the corporation, made in December, 1839, by which he was discharged from the obligations of his contract, his-mortgages cancelled, and his. brother substituted as a contractor to finish the road, for which he was to receive the sum of $15,000. The ahswers of the other defendants who did answer, do little else than to deny the frauds charged.
Proof was taken on both sides, and the release or discharge of Petrie of December, 1839, was set aside, an account ordered, and a final decree rendered for $73,147.
As the transactions between the Brandon Bank and Petrie are exclusively the subject of this investigation, it is necessary that the conditions and stipulations of the contract out of which these transactions grew, should be noted. It would seem that there was another corporation in existence, created for the purpose of erecting a turnpike or railroad from Jackson to Brandon, called the Brandon Railroad and Bridge Company, which joined in the contract made with the Mississippi and Alabama Railroad *704 Company by Petrie. A previous contract had been made between Petrie and the first named corporation, to buiid a bridge over Pearl river,' and a turnpike over the low ground adjacent thereto. It seems to have been the object to merge the first contract in the second, or at least' to make it part of the second. Petrie agreed in the last contract to do all the grubbing, grading, &c. necessary to the completion of a railroad from the depot lot in Jackson to the western bank of Pearl river; and from the termination of the bridge on the east bank to Brandon ; to furnish all the materials, including iron; to put down the whole superstructure, with the necessary turns-out, turning platforms, side roads, water stations, road crossings, &c.; to build a frame warehouse and engine house at Brandon, and to furnish a locomotive engine of the most approved construction, a tender and eight cars, and to put the road in complete operation. This contract was not to be so construed as to include the building of the bridge over Pearl river. After stating the width of the road, the contract proceeds to recite that the Jackson and Brandon Railroad and Bridge Company had abandoned their scheme, and thereby released and conveyed to the Brandon Bank their rights and privileges, timber, &c. on the track.
In consideration of Petrie’s covenant, the bank agreed to pay him $204,000, and an additional sum of not exceeding two dollars per cubic yard, for excavating rock, the first payment of $ to be made within one month after the commencement of the work; the other payments at intervals of about thirty days, as money might be required for the prosecution of the work, and for the purchase of iron and an engiue, of which Petrie was to determine. Besides the above-mentioned terms of payment, the bank agreed, at the expiration of thirty days, to invest Petrie with power to draw bills of exchange on the bank, for $100,000, in instalments of $20,000 each, which sum was to be applied in the purchase of slaves to work on the road, who were to be mortgaged to the bank, with all other property owned by Petrie, to secure the performance of the contract. The work was to be commenced in one month, and finished within two years, and if sooner finished, Petrie was to have the right to the use of it until the time expired.
*705 It was also understood that if Petrie failed to use diligence and energy in the prosecution of the work, or should fail to give assurances that he would complete it, the president of the company was invested with power to declare the contract abandoned, and to re-let the work, which declaration should exonerate the bank from liability, and subject Petrie to damages.
By the contract-with the Bridge Company, Petrie agreed to erect a bridge over Pearl river, of a given description, with two tracks, one for the railroad, and another for ordinary use, for which he was to receive $37,500. He was also to construct a road from the termination of the bridge, in an eastwardly direction, to the termination of the swamp, and to build all necessary bridges, for which he was to receive for the embankment, forty-four cents per cubic yard, and for the bridging ten dollars per foot lineal.
The discharge set up by Petrie is contained in certain resolutions adopted bykhe board of directors, by the first of which William- Petrie was released from that part of his contract, by which he had obligated himself to furnish a locomotive engine, the price thereof, $7000, to be placed to his credit. By the second resolution, the cashier was required to cancel the mortgages given by Petrie. The third contains a preamble stating that the company were under obligations to furnish Petrie with a certain amount of par funds, to enable him to complete the road, and being unable to do so, therefore it was resolved that Petrie be requested to finish the road at his own expense, and retain the use of it until the profits should re-imburse him for. any balance that might be due after the completion of the road.
A difference of opinion seems to exist between counsel, in reference to the construction of the contract, in one important particular; that, is, whether Petrie was to receive the sum contracted to be paid him by the Bridge Company, in addition to the sum of $204,000. The parties to the first contract joined in the second, which refers to the first contract, and all the rights acquired by the first, were assigned or transferred by the *706 second, and it was therefore made a part of the second contract. The Brandon Bank was substituted in the place of the Bridge Company, to carry out the original contract; to receive the benefit resulting from its performance, and of course took upon itself the obligation to pay for the work. There is one clause in the contract which declares that the Bridge Company had abandoned the scheme, and that all the rights and privileges were assigned to the Brandon Bank. The president, and directors of which, thereby contracted with Petrie “ to construct the railroad aforesaid, from the points aforesaid, in the planner and form aforesaid.” The whole of this clause seems to refer to the contract between Petrie and the Bridge Company, and to adopt its provisions as the contract between Petrie and the bank. Besides, it- is expressly stated in the second contract, that the building of the bridge was not included. Petrie then was to receive $204,000 for the railroad; an additional sum for excavating rock, which is charged in the accounts at $4584. He was also entitled to receive for the bridge tile sum of $37,500. If he proceeded to work on the turnpike, which he had agreed with the Bridge Company to construct, then he was entitled to be paid for embankments and bridges, according to that contract. On this last point the case is involved in some doubt. The amount claimed for embankments and bridging, is $29,709, besides pn additional sum of $6000, on account of a debt due him from the Bridge Company. The aggregate amount of these several sums is $281,783. It seems probable the turnpike was to be finished, as the bridge was to be built with a partition, one side to be used for ordinary purposes of travel, and the other for the railroad. The clause of the contract, too, above referred to, seems to embrace the whole of the contractas made with the Bridge Company. It follows that Petrie was to have received, for completing the work, an amount much beyond that assumed by the complainant’s counsel as the true one. Having settled, then, the construction of the original contract between the parties, we proceed to the contract of settlement and discharge, because, if that be valid, it is conclusive, and we need not inquire how far the first engagement has been *707 performed, as the discharge must be considered as an admission of performance, or a waiver of non-performance — a final adjustment of the whole matter.
First, then, as to the legal effect of the contract of settlement, and second, as to the evidence of fraud on which it is attacked.
First, it is contended that the release was not made with due solemnity, so as to be binding. The doctrine is now entirely exploded, that corporations can contract only under their corporate seal. They may contract by vote entered on the books of the corporation, and binding contracts may be implied from corporate acts, without either a vote, a deed, or writing, and they are bound by all contracts made by their agents within the scope of their authority. 2 Kent’s Com. 5th ed. 288 to 292. It is said, in an approved treatise on the law of corporations, that “ the course of modern decisions seems to place corporations, with regard to their mode of appointing agents, and making contracts in general, upon the same footing with natural persons. They may appoint all their agents, and make all their contracts by deed ; but are no more compelled so to do than individuals.” Ang. & Ames, 110. So far, then, as the resolutions go, which were adopted by the board of directors on the 21st of December, 1839, they are undoubtedly binding; but there is a part of the contract which does not appear in the resolutions, to wit, that F. H. Petrie should be substituted as a contractor to finish the road, instead of William Petrie, and receive the sum of fifteen thousand dollars, with privilege to retain the road until that sum should be paid him. This part of the agreement rests in parol, but is established fully by every witness who has spoken on the subject, in addition to which F. H. Petrie, with the knowledge of the corporation, did proceed to work on the road, and continued to do so for some time after this settlement. The circumstances are abundantly sufficient to raise an implied contract on the part of the corporation in favor of F. H. Petrie. It is said, moreover, by some of the witnesses, that it was intended that this contract with F. H. Petrie should be reduced to writing, but that perhaps was omitted. *708 The first resolution released William Petrie from his obligation to furnish an engine; the second directed that his mortgages should be cancelled; and the third, after admitting in a preamble that the corporation had failed to suply him with par funds, requested that he should proceed ,to finish the road at his own expense, and retain it until he should be repaid by the profits. These resolutions amount to an abandonment of the contract, by substituting new terms and conditions inconsistent with the original agreement. The last resolution, construed in connection with its preamble, left the completion of the road entirely at the discretion of Petrie. He might finish it or not, as he pleased. The understanding, however, seems to have been that the road was to be finished ; but it was to be finished by F. H. Petrie, and William Petrie gave his verbal promise that it should be finished by his brother. This whole transaction, then, as disclosed by the resolutions and by the parol proof, amounted to a settlement with Petrie, and it seems to have been the action of the entire board of directors. It -is spoken of by all the witnesses as one entire transaction, made by the concurrence of the directors, whilst in the meeting which adopted the resolutions. Not only then was this ádjnstment entered into with sufficient solemnity to make it binding on the corporation, but its legal consequence was a discharge of Petrie, and a settlement of balances.
Second, was it fradulent as to creditors'? It is not one of those cases in which the fraud is apparent from the subject-matter of the contract alone, or from the circumstances and conditions of the parties contracting. If there was a device to take an unconscientious advantage of the creditors of the corporation, it must be gathered’from the proof introduced in the cause, either direct or circumstantial. The superiority of a court of chancery over a court of law in the investigation of questions of fraud, consists in its power to elicit from the parties concerned, a conscientious disclosure of the circumstances, and thus to penetrate their motives. When’ the question depends upon the testimony of third persons, a court of law, through the aid of a jury, may accomplish all that a chancellor can. The merits of *709 this case do not depend upon the testimony of the parties to the record alone, but disinterested persons have been examined by both parties; of course their direct testimony must be considered as entitled to great weight in the conclusion. It is not denied, that strong presumptive evidence of fraud will outweigh positive proof against it. But it is not to be presumed from slight circumstantial evidence, especially when it is opposed by unquestionable positive testimony. The testimony on this subject was given in answer to the interrogatories propounded to the witnesses examined hy respondents. R. G. Crozier, the first witness examined, .states that he does not believe there was any fraud in the settlement. William H. Shelton states that the settlement was fair and open, made by a majority of the directors, and that no fraud was intended or committed. He gives the circumstances of the settlement, and says that it appeared that the accounts against Petrie had been improperly kept, and amounts improperly charged to him; that upon a review of the whole matter, delays in the work, loss by uncurrent funds, &c., it was agreed, that if Petrie would finish the work, the corporation would release all claims against him; and it was further agreed, that F. H. Petrie should finish the work, William Petrie becoming responsible for his performance. Thomas J. Coffee makes identically the same statement. John T. Blow says that he had no knowledge of fraud. He was at the board when the settlement was made ; that it was final and satisfactory to all parties. H. K. Moss gives the same history of the settlement as that given by the other witnesses, and states that there was no agreement for the purpose of deceiving or defrauding creditors; that Petrie was not then indebted to the company, but on the contrary the company owed him, and he agreed to relinquish the balance if the company would make a final settlement. This was agreed to, if F. H. Petrie would agree to finish the road for $15,000, and on his agreeing to do so, the final settlement was made. F. H. Petrie also states, that at the date of the settlement the corporation owed William Petrie $15,000, which sum he was to receive for finishing the road, and William Petrie was discharged,
*710 Charles Lynch, a witness for complainants, states that he was present, and the presiding officer of the board, when the settlement was made relative to the building of the bridge and railroad ; that Petrie then stated that the corporation had failed to comply with its engagements; that some excitement and warmth occurred in the investigation and settlement, and after it was completed Petrie complained that he had not been allowed as much as he was entitled to. He knew of no fraud or collusion between Petrie and the directors; and, so far as he knew, the settlement was fair and bona fide. George Adams, another witness for complainants, who was the attorney of the corporation, and present at the settlement, gives the same answer to the cross-interrogatory, that was given by Governor Lynch. The whole of the direct proof then, goes directly, and in the most unqualified manner, to negative the idea of fraud.
We have said that fraud may be. established by strong circumstantial evidence, even against positive proof denying it; there is no direct or positive proof of fraud, but all the witnesses, deny its existence; what then are the circumstances from which it can be inferred 1 Every case in which fraud is charged, must be determined upon its own peculiar circumstances. The forms in which it may be perpetrated, are as varied as human ingenuity is boundless. It is odious to the moral sense of mankind, as well as to the law; hence it is seldom to be found where there is not some strong motive for its perpetration. The bill charges fraud on all the directors generally, and the amended bill charges that the settlement was fraudulent. If there was any such thing, it was of course committed by all the directors present at the meeting of December, 1839. There were eight members present. It is difficult to believe that these eight persons would lend themselves to fraudulent purposes, and it is still more difficult to believe that they would falsely swear that the transaction was fair, if it were not so. It is scarcely probable, either, that a device could have been practised by part of them, without detection by the others. All of these individuals have been sworn except one, and have testified to the fairness of the transaction. Most of them seem to have had so little in *711 terest in the matter as to have suffered a pro confesso. These may be but slight circumstances, but they should not be overlooked. The great point relied on is, that Petrie received more than he was to have received for completing the work. If the directors were so regardless of their duties to the creditors, as to give him a much larger sum than he was entitled to or claimed, it might amount to a fraud in law. The doctrine is no doubt true, that a voluntary release of securities held by a corporation would be void as to creditors. But what was Petrie entitled to, and what has he received 1 The contract shows what he would have been entitled to on completing the work. The aggregate of the sums, under both contracts, amounts to upwards of $281,000; the various estimates of the amounts received by him, prove that it is next to impossible to ascertain the amount he did receive. He states in his answer that it was $298,021, and makes his account with the corporation an exhibit to his answer. By the 29th specific interrogatory in the bill, he was required to state, at what times and for what sums he had checked or drawn on the bank, and was also required to state all the items of money drawn for, or advanced to him. In answer to this interrogatory, he refers to the account made an exhibit to his answer, and states that it shows all the money ever received by him from the bank. This answer, being a direct response to the interrogatory, is evidence as well for Petrie as against him, and must be regarded as conclusive, unless it is shown to be false. Alexander v. Wallace, 10 Yerger, 105; Woodcock v. Bennett, 1 Cow. 711. Nor is it to be discredited, or any presumption indulged against it on account of its being the answer of a party interested : per Thompson Justice, in Clason v. Morris, 10 Johns. R. 524. On this subject, Shelton stated that he had not the control of the drafts and checks of Petrie, but from the ledger of the bank then before him, it appeared that Petrie had drawn the sum of $294,794 91, and if he was properly chargeable with the price of the railroad iron, which had been taken in New Orleans by an attachment against the bank, it would make the additional sum of $17,266 95, which, added to the sum appearing on the ledger, *712 swells it to $312,061 86 ; at the same time he stated, that by-mistake of the cashier the accounts of Petrie had been improperly kept under the head of “ Railroad Expenditures,” and that in this way improper charges had been made against him. Petrie was bound to pay for the railroad iron, and was therefore responsible to the bank for it, but he was certainly not chargeable with railroad iron which was sold under an attachment against the bank in New Orleans ; so that Shelton’s testimony places the sum received by Petrie near his own admission. It cannot be doubted but these charges, made in the books of the bank, were for the nominal and not the actual value of the money. The witness also mentioned another sum of $126,000, given to Petrie when he was about to start to New Orleans, which he was authorized to sell at its market price, which he accounted for at eighteen cents in the dollar, making twenty-two thousand five hundred dollars. The book referred to by the witness was an unsafe reliance, as it is stated by several of the witnesses that the accounts were improperly kept, by making improper charges against Petrie.
The witness, Bullock, appended to his deposition an account or'statement of Petrie’s liabilities, at which he placed the sum at $451,666 11. He was book-keeper and teller, and states that the account contained improper charges to the amount of 40 or $50,000, and mentions several items improperly charged to Petrie. This account contains also the charge of $125,000 spoken of by Shelton, which Petrie was authorized to sell at what it would bring, which was settled for at eighteen cents in the dollar. This reduces the account $102,500. The railroad iron is also charged at $17,266. If we add to these sums $40,000, the lowest estimate made by the witness for improper charges, we have an aggregate of $159,766, which, deducted from the amount of the account, shows the sum received by Petrie to have been $291,790, being less than Petrie admits he received. The testimony of this witness then corroborates the answer of Petrie.
T. J. Coffee, in his deposition, says nothing as to the amount received by Petrie, except to refer to a paper marked C, at *713 tached to Blow’s deposition. By reference to this exhibit, it is found to be a resolution of the directors, in which it was determined to be inexpedient to abandon the project of completing the road, after having expended upwards of $300,000 on it. This resolution is in round numbers ; it does not refer to items,, and proves nothing. It was at best but a rough estimate of the expenditure.
Blow also states that improper charges were made against Petrie, and in answer to an inquiry as to the amount received by Petrie, he refers to exhibit D to his answer, which is not found attached. He states that at the settlement made in 1839, Petrie brought the bank in debt about $30,000, but for the sake of a settlement, he being in bad health, he relinquished his claim; and he also states that the cost of a locomotive was then charged against him. Moss makes the same statement as to the balance in favor of Petrie at the settlement. In all this mass of testimony, there is nothing which enables us to fix, with certainty, the amount of money received by Petrie, at a sum which varies much from his own statement. The accounts seem to have been so loosely kept as to place certainty out of the question. We cannot say that the answer of Petrie is satisfactorily disproved, and must therefore adopt it as evidence of the true amount.
But it is argued that this amount was received by him in par funds, and that it was more than he was entitled to for the completion of the road, which is still unfinished. The witnesses all say that he received his payments, in the notes of the bank, which were greatly depreciated, except 10 or $15,000, which he received in par funds. They unite also in stating, that he sustained great losses in consequence of being compelled to receive depreciated currency. It is also said, that by his own account, before referred to, it appears that he received the amount therein stated in par funds. This is a mistake of counsel. It is stated positively in the answer that the sum received by him was mostly in the notes of the corporation, which were at a discount; that he received them at par, with a few exceptions noted in the account current made an exhibit to the *714 answer. This is the same account before noticed, and by a reference to it, deductions are only made in two or three instances on account of uncurrent money, one of which is the check for $125,000, which he was authorized to sell at its current price, for which he has charged himself $22,500. The answer in this particular is fully sustained by the witnesses, all of whom testified that his payments, with a very small exception, were received in the notes of the Brandon Bank, and that he sustained heavy losses and suffered great inconvenience as a consequence. The contract was for the payment of so much money ; it was not a compliance with it to pay in depreciated paper; the bank was bound to make good the amount lost by depreciation. The current value of the notes at the time received, was the extent of his legal obligation as a debtor to the bank.
Another circumstance, from, which fraud is attempted to be inferred, is the extravagant allowance made by the directors to Petrie, on the final settlement for damages, as an evidence of which the paper called his “ approximate estimate of the advanced cost of constructing the Jackson and Brandon'Railroad, Turnpike and Bridge, on account of the failure of the company to comply with their engagements,” is referred to. This document was the subject of severe comment, and certainly it bears some evidences of extravagant and even unfounded estimates. But some of the charges are undoubtedly such as might well be made under the circumstances; for instance, $39,000 loss on $260,000 of uncurrent money. Loss of $4000, by being compelled to purchase on credit at advanced prices, in consequence of the failure to supply par funds at the time agreed on; and the loss arising from a year’s detention over the time the work was to have been finished. If these losses were occasioned by the bank, justice required that some compensation should be made. But a complete answer to the argument on this subject is found in the fact that the directors did not allow all of this claim. Blow and Moss, and perhaps other witnesses, state that the directors refused to allow all the claim for damages. Governor Lynch proves that Petrie complained very much, *715 after the settlement, that his claim had been unjustly curtailed. And notwithstanding part of his claim was rejected, it seems that he still brought the bank in debt. Moss and Blow both say that there was a balance due him of $30,000, and this too, after charging him with the price of a locomotive engine, which sum he agreed to relinquish, for the sake of a settlement and discharge. Shelton says it was agreed, if Petrie would finish the road, the company would release all claims, and allow him $15,000, with liberty to receive the profits until they should pay that amount. Coffee says the company acknowledged that it would be indebted in the sum of $15,000, when the road should be finished. It seems then that Petrie had preferred claims against the company, some of which, at least, were founded in justice. He had been engaged in the performance of a heavy contract, and was occupied nearly a year longer than the time agreed on. He had worked on with the approbation of the company, which was making its payments in depreciated paper. He had obstacles to encounter from the owners of land, and from other causes. Is it so remarkable that unforeseen claims should have originated, and is it an evidence of fraud that in the settlement of these claims, mutual concessions should have been made, for the sake of compromising the difficulty ? It is but the common case of a job of work costing more than was anticipated. Even supposing that he was allowed more than he was strictly entitled to, that of itself is not a fraud; there must be a device to injure others, or the act must be so grossly extravagant and wasteful as to amount to fraud in law. Petrie had received about $298,000; all of that sum, except 30 or $40,000, was in depreciated paper. Judging from what the witnesses, say, he must have lost near $30,000, or perhaps even over that sum. This item alone reduces the actual amount received by him, considerably below the price of the work. It is stated also that the directors had previously determined to make up his losses in this respect. The extravagance of the allowance, then, is certainly not so glaring as to furnish evidence of fraud.
It was urged that there was too much informality in making *716 this settlement for it to be valid; that accounts in writing were not made out on both sides. Some of the witnesses testify that accounts on both sides were presented. We must then suppose the fact was so. But suppose it were not so, what better guide was there to a correct understanding and full disclosure of the .mutual liabilities than the books of the bank? If they were correctly kept, they contained every item of charge and discharge. An account taken from the books cannot be better than the books themselves. Such a circumstance, then, would prove nothing.
But it was assumed in argument, that fraud was conclusively established by the circumstance that Petrie engaged in the contract a poor man, and abandoned it unperformed, in something less than three years, with slaves worth $136,000, and other property, for which he owed nothing. This position is not altogether sustained by the testimony. If it were so, it would be a suspicious circumstance, but still not conclusive. To hold that such a fact was conclusive evidence of fraud, would be to establish a rule destructive of all speculations, and dangerous to many of the property-holders in this state. But as this is a legitimate argument in the pursuit of the object, it becomes necessary to look at all the prominent facts in the case, that we may be certain this sudden change of condition cannot be accounted for on fair principles. On the two contracts Petrie was to have been paid $281,000, in round numbers, at such times as he might require it. Of this sum he invested $136,000 in slaves, being $36,000 more than he agreed to invest in that way. These slaves, when purchased, belonged to him .individually. Every witness states that he never bought any for the company, and that the company had no right or interest, whatever, in the slaves, except to have them mortgaged as a security for the performance of the contract. Mortgages were given on part of them, but afterwards cancelled. With these slaves Petrie commenced the work on the road, having still $145,000 to furnish materials, and to support his slaves. The road was to have been completed in two years, but he was engaged nearly three. The whole of the grading was done; the *717 rock excavated; thé embankments made, and the wood work all laid, ready for the iron, except about a half or three quarters of a mile. The materials for. the houses and bridge were ready, though not on the ground where they were to be erected. The piers or butments of the bridge over Pearl river were built, and in short the road was so nearly completed as to require but $15,000 to finish it, exclusive, as we must suppose, of the railroad iron, valued at $17,000. And, if we believe the witnesses, Petrie was still anxious to finish the work. Was there any fault or fraud, on his part, that it was not completed according to the contract? The witnesses all say that the fault was not his, but that it occurred by the failure of the company to supply him with par funds, or by the failure to procure the relinquishments to the right of way. These are assigned as reasons, and the proof is too clear to admit of doubt, that much the largest part of the money he received was in depreciated notes. It is equally well established, that he was impeded in his progress, for want of the right of way. Counsel have relied on discrepancies in the statements of witnesses on this subject, for the purpose of destroying the effect of their testimony. We see nothing that will justify us in disregarding the evidence. That the company failed in another important particular, is beyond question. The iron was purchased for Petrie, but attached for the debts of the corporation, and sold. Although the bank was under no obligation to purchase it for him, yet it was under obligation to furnish him such funds as would buy it. This, it seems, it could only do by applying part of a sum of money then in the hands of its merchant in England, which was accordingly done, and it should have been relieved by the bank from the attachment for its debts. Here we may remark, that there was no impropriety in Petrie’s asserting title to it under such circumstances. Notwithstanding these failures, it was assumed in argument that the company had complied with all its engagements, as a proof of which it is said that in twelve months he had received a sum of money equal to the whole amount of the contract; at the expiration of two- years he had received $273,410, and by the 18th of *718 November, 1839, the full sum of $298,000, in par funds, according to his own answer. We repeat, the answer does not admit the reception of par funds: and even if these amounts had been received at the times specified, still the instalments may not have been paid at the times they were required. Although a gross sum may have been received during the whole year, yet great inconvenience may have resulted from a failure to pay at the particular times it was required. But it is not true that Petrie derived all his wealth from the profits of this job. By a specific interrogatory he was required to state what he was worth when he commenced the work, in answer to which he estimated his wealth at $20,000. This answer is corroborated by the witnesses, besides which we have positive evidence that he borrowed near $30,000 from his brother, and gave a mortgage to secure the payment. We have, then, to deduct about $50,000 of his fortune from the total amount; and the balance is what he made by the job. Taking into consideration, then, the total amount he was to have been paid for the job, and the means he took to accomplish it, it would naturally be expected that he must have left it with a number of slaves. Then, when it is remembered that about $50,000 were derived from different sources, the circumstance of his wealth loses much of its force, as an evidence of fraud. . Besides, it may have been, and probably was, a very good bargain on his part; but it was not on that account fraudulent. He may also, on the settlement, have been allowed a few dollars more than he was entitled to; that would not vitiate the contract. A court of chancery cannot interpose, merely because the bargain was imprudent, or because a party may have been paid something more than he was entitled to. As inadequacy of price will not vitiate on the one hand, neither will exorbitancy of price vitiate on the other. There must be some ingredient of fraud.
Much reliance was also placed upon the letter of Petrie to Shelton as president of the corporation, in which it is said he represents the negroes purchased by him as the property of the *719 company. We do not understand the letter as containing any such admission. It seems to have been a reply to a request made of Petrie to state how much had been expended on the railroad. He gives the items for which the expenditures had been made, but does not represent these items as the property of the bank. He says for slaves purchased, so much had been expended, but does not disclaim his own title to the slaves. The bank was, according to this letter, so much out of pocket for the road, but it could not own both the road and the slaves. If it owned the slaves, it >vas not so much expended, but so much changed from money into property, and if the bank charged itself for the expenditure and owned the property, it was entitled to be credited for the property, so that the accounts ought to have been balanced. Yet we find, in the commissioners report, an amount stated as having been expended on the road. If the negroes belonged to the bank, the letter was not true, because their value had not been expended by the bank on the road, but was so much expended in property. If, on the other hand, the negroes were Petrie’s property, then the bank had expended their value on the road.
A resolution of the board of directors, adopted on the 10th of September, 1839, was adverted to in the argument as an evidence of fraud. It was passed about the time Petrie was to start to New Orleans to release the railroad iron, and ils object was to prevent his arrest. It declares that the bank would not consider Petrie its debtor until the road should be finished, and then if any balance should remain due, he should be at liberty to pay in the notes of the bank. The resolution, unexplained, amounts to but little, and the explanation does not tend to establish fraud as to these complainants. It proves a profuse disbursement of the notes of the bank in an effort to release the railroad iron, as it was then that Petrie received the $125,000 check, which, considered at par, would have made Petrie debtor to the bank. How far this transaction might have been considered fraudulent as to New Orleans creditors, on whom it was intended to operate, we need not inquire. This was evidently the resolution referred to by complainant’s witnesses, King and Pucket, and explains their testimony.
*720 We have thus noticed the positive testimony in reference to the charge of fraud in the final settlement, and also the facts and circumstances from which it is attempted to. be inferred. It may have been a fraudulent settlement, although we cannot perceive it. We are to be guided by the direct or positive proof, and by such legitimate deductions from the circumstances as they seem to us to warrant. There may be much in the transaction calculated to excite suspicion, but we cannot yield to mere suspicions against positive proof uncontradicted and unimpeached.
A few remarks will be added in reference to the propriety of the decree on the cáse as it was supposed to have been made out. The complainants are judgment creditors, seeking to subject equitable assets of the bank, or a debt due to it, whichever might turn out to be the case, and to have them appropriated in satisfaction of their judgments. They charge fraud in the original contract by which the bank acquired the equity, and seek to vacate it. Of that, however, there is no proof. They then charge that by this contract a mortgage was to have been given on negroes and other property, which vested an equitable interest in the bank, and, being creditors, that they have a right to the benefit of this mortgage. The contract examined sustains the charge thus far; Petrie did agree to buy slaves and to give a mortgage on them as a security for the performance of the work. When a party agrees to make a security in future, that is construed in equity as an equitable mortgage. But Petrie complied with the contract in this respect by executing the mortgage; the equitable mortgage was merged in this, and when the contract by which the express mortgage was cancelled was rescinded by the chancellor, it restored the mortgage. It would, seem, therefore, that the bill should have been framed and the decree made on the mortgage. But suppose all was right in this respect, and we are not disposed to controvert it, how is the decree sustained by the equitable mortgage? That mortgage was not given to secure a debt or money ridvances to be made to Petrie, but to secure the performance of a covenant, the non performance of which sounded in damages merely. *721 The mortgage was not necessarily forfeited because Petrie did not complete the work. The right of the bank under this equitable mortgage, depended upon the amount of damages it sustained in consequence of the non-performance of the work; to that extent the mortgage was a security. How were the damages to be ascertained ? By arbitration, as agreed on in the contract, or by the verdict of a jury. A court of chancery has no power to assess damages. It was a contract containing mutual undertakings; in a suit at law the company would have been compelled to prove the performance of conditions, otherwise no damages could have been recovered, and of course the mortgage must have remained inoperative. In common cases of a mortgage of personal property, it is said that on forfeiture the right becomes absolute in the mortgagee; but in this instance what was a forfeiture ? It was a thing unascertained.
But what was the professed foundation of the decree against Petrie in this instance ? An account was taken to ascertain how much money he had received over and above the amount he was entitled to; whatever that was, on the principles of the decree, he was debtor to the bank. The commissioner reported him in debt so much ; the report was confirmed, thus declaring him to be a debtor to the bank, and a decree passed for the amount, which is also a decree of foreclosure, and directs that in case of non-payment, the property shall be sold. Now Petrie had given no mortgage to pay a debt. The contract made n© provision for advances beyond the amount agreed on, nor did it make any provisions for security in case-such advances should be made, and the contract must govern. If, then, Petrie did receive more than he was entitled to, he was debtor to the bank, not by mortgage, but by simple contract. With all deference to the. opinion of the chancellor we cannot see how a decree of foreclosure could follow. If a man give a mortgage to pay one debt, or to do a specific thing, can that mortgage be foreclosed for the non-payment of another debt not intended to be secured, or the non-performance of another thing? It would seem not. If this view of the subject be correct, the negroes were not involved in this controversy. The chancellor in *722 inquiring whether Petrie’s liability was such as might he pursued in equity, ahd whether the complainants were authorized to file a bill for that purpose, says, “ it seems now to be the rule in England, that in order to render a conveyance void, made by a debtor, it .is necessary that the conveyance should embrace property liable to be seized by execution at law, and applied to the payment of the debts of the grantor. As a consequence of this doctrine it has been held, that a voluntary transfer of stock, choses in action, or other property not liable to be taken in execution, is good, notwithstanding the provisions of the statute of 13 Elizabeth.” Without acknowledging this principle, we would merely remark that the most that was transferred or relinquished by the contract which was set aside, was an undefined, unascertained, and uncertain claim for damages, and an alleged balance of indebtedness.
We have laid the account taken in this case out of view, as that could not be brought in to aid the decree which' preceded it. The case has been considered as it was presented to the chancellor before, the decree setting aside the contract of discharge. If that was wrong on the pleadings and proofs, then the account was improperly ordered, and its result cannot change the prior aspect of the case. Our conclusion on the merits of the case, renders it unnecessary for us to say anything on the technical questions discussed, and equally unnecessary that we should express any opinion as to the kind of funds Petrie was bound to pay.
As counsel have agreed in this case that an investigation on the merits should be final, and that investigation having been made, the decree is reversed and the bill dismissed.
Mr. Justice Thacher.
I have participated in the examination of this case, and concur in the judgment of the court as contained in the opinion of the chief justice.